**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LEE BAKER,                                           :
          Petitioner,                 :
                            :        CIVIL ACTION
     v.                                          :        No. 96-0037
                            :
MARTIN HORN, et al.,                           :
          Respondents.             :

## MEMORANDUM AND ORDER

**Anita B. Brody, J.**                                           **August 15 , 2005**

## CONTENTS

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
III. Review of Baker v. Horn, 210 F. Supp. 2d 592 (E.D.Pa. 2002) . . . . . . . . . . . . . . . . . . . . 3
    A. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B. Application of AEDPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    C. AEDPA Timeliness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        2. Statutory Tolling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        3. Equitable Tolling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    D. Exhaustion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    E. Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
        1. Procedural History of PCRA Petition of 1/15/97 . . . . . . . . . . . . . . . 45
        2. Actual Violation of Procedural Rules Relating to PCRA Withdrawal
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
        3. Consistent Application of Rules Relating to PCRA Withdrawal . . . . 54
        4. Pennsylvania's "Relaxed Waiver" Doctrine . . . . . . . . . . . . . . . . . . . 58
IV. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
V. Accomplice Liability Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
    A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
    B. Direct Due Process Challenge to Jury Instructions . . . . . . . . . . . . . . . . . . . . . . 65
        1. Federal Due Process Requirements . . . . . . . . . . . . . . . . . . . . . . . . . 66
        2. Pennsylvania Law of First Degree Murder and Accomplice Liability
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
        3. Baker's Jury Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

          4.  Reasonable Likelihood Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

          5.  Harmless Error Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

    C.  Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

          1.  Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

          2.  Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

XII.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

## I.  Introduction

Herbert[1] Baker Jr. ("Baker") petitions this court for a writ of habeas corpus pursuant to 28

U.S.C. § 2254.  For the following reasons, Baker's petition is granted in part.


## II.  Factual Background

The following facts are taken from the Pennsylvania Supreme Court's decision on

Baker's direct appeal, <u>Commonwealth v. Baker</u>, 614 A.2d 663, 665 (Pa. 1993) ("<u>Commonwealth</u>

<u>v. Baker II</u>").[2]  A Pennsylvania jury convicted Baker and co-defendants Eric Joseph ("Joseph")

and Mark Mitchell ("Mitchell") of first degree murder, robbery, criminal conspiracy, and

possession of an instrument of crime for their roles in the armed robbery of the Metro Oil

Company ("Metro Oil") and the murder of its owner, William Gambrell ("Gambrell").  Evidence

---

[1]Due to an apparent bureaucratic error, petitioner was tried in state court under the name of his brother, Lee Baker.  Petitioner's name is Herbert Baker Jr.  (Am. Pet. Habeas Corpus at 1 n.1); Tr. Nov. 18, 1987 at 49.

[2]In the course of Baker's conviction, direct appeal, and collateral challenges, state and federal courts have collectively issued more than ten written opinions as well as numerous orders.  In this memorandum, I will refer to many of those orders and opinions issued by the state courts as "<u>Commonwealth v. Baker I</u>," "<u>Commonwealth v. Baker II</u>," "<u>Commonwealth v. Baker III</u>," etc.  I will refer to those opinions and orders I issued in federal court as "<u>Baker v. Horn I</u>," "<u>Baker v. Horn II</u>," and "<u>Baker v. Horn III</u>."  The numbering is chronological within each jurisdiction.  <u>See</u> procedural chronology, <u>infra</u>.

presented at trial showed that Baker and his co-defendants, upon entering the premises of Metro

Oil, seized two employees, Adrian Crosby ("Crosby") and Thomas Dolan ("Dolan").  Baker and

Joseph directed Dolan at gunpoint to lead them to a second floor room to open the company safe.

The men arrived to find Gambrell sitting in his second-floor office.  The Commonwealth

presented sufficient evidence for a jury to find that Baker then shot Gambrell twice.  However,

Baker, in a statement presented at trial, stated that Joseph had fired over Baker's shoulder.

Gambrell died from the gunshot wounds.  Unable to open the safe, the three defendants fled with

weapons and money they found on the premises.  A bullet taken from the victim's body was

identified as a .38 caliber, but the weapon used in the crime was never recovered.  The jury

returned their verdicts of guilt on all charges and as to all defendants on October 4, 1984.

Following a penalty hearing, the jury sentenced Baker to death and sentenced Mitchell and

Joseph to life imprisonment.


**III.  Review of <u>Baker v. Horn</u>, 210 F. Supp. 2d 592 (E.D.Pa. 2002) ("<u>Baker v. Horn III</u>")**

      **A.  Procedural History**

Baker's case rests before me following a unique and complicated procedural history.  I

recounted that history in great detail in an earlier opinion denying the Commonwealth's motion

to dismiss Baker's petition as untimely or in the alternative to dismiss certain claims as

procedurally defaulted.  <u>Baker v. Horn</u>, 210 F. Supp. 2d 592 (E.D.Pa. 2002) ("<u>Baker v. Horn

III</u>").  I reproduce with additions the procedural chronology included within that opinion here:[3]

--------------------------------

    [3]All state court proceedings are italicized; federal court proceedings are in ordinary Times
New Roman font.

| | |
|---|---|
| *October 4, 1984* | *Lee Baker was convicted of first degree murder before the Honorable Alfred F. Sabo in the Court of Common Pleas of Philadelphia County.* |
| *January 30, 1985* | *Judge Sabo sentenced Baker to death.* |
| *February 11, 1985* | *Baker filed a motion with Judge Sabo to modify his sentence.* |
| *February 14, 1985* | *Judge Sabo denied the motion to modify Baker's sentence without a hearing. As he was automatically entitled, Baker appealed to the Pennsylvania Supreme Court.* |
| *February 3, 1986* | *The Court of Common Pleas of Philadelphia County appointed new counsel to represent Baker.* |
| *July 17, 1986* | *Baker filed a petition with the Pennsylvania Supreme Court to remand the case to the trial court to address claims of ineffective assistance of trial counsel.* |
| *November 10, 1986* | *The Pennsylvania Supreme Court granted Baker's petition to remand. The case was remanded to Judge Sabo.* |
| *April 10, 1987* | *Baker filed a "petition pursuant to the Post-Conviction Hearing Act" ("PCHA petition of 4/10/87") raising claims of ineffective assistance of counsel.[4]* |

---

[4]Baker's PCHA petition of 4/10/87 included the following claims of ineffective assistance of trial counsel:

   (1) failure to timely move for an identification line-up of all purported witnesses;
   (2) failure to request appointment of an investigator or to conduct an investigation himself;
   (3) failure to call witnesses who previously stated that Baker was not observed at the location of the crime;
   (4) failure to cross-examine identification witness Crosby;
   (5) failure to cross-examine identification witness Dolan;
   (6) failure to explain to Baker that unless he testified in his own defense, his statement given to the police following his arrest would be deemed to have been voluntary;
   (7) failure to argue in support of motion to suppress that one detective testified that he was not present at the interrogation while a second detective testified that the first detective was present;

4

| November 18, 1987 | *After a hearing, Judge Sabo dismissed Baker's PCHA petition of 4/10/87.  Baker again appealed the original judgment of sentence of death imposed on 1/30/85, and also appealed Judge Sabo's dismissal of the petition of 4/10/87.* |
| --- | --- |
| May 2, 1988 | *Judge Sabo filed an opinion in support of his denial of Baker's claims of ineffective assistance of counsel included within the PCHA petition of 4/10/87.  <u>Commonwealth v. Baker</u>, No. 514-520 (Pa. Comm. Pl. Ct. May 2, 1988) ("<u>**Commonwealth v. Baker I**</u>").* |
| June 17, 1992 | *The Pennsylvania Supreme Court affirmed both the judgment of sentence of death and Judge Sabo's dismissal of the petition of 4/10/87.  <u>See Commonwealth v. Baker</u>, 531 Pa. 541, 614 A.2d 663 (Pa. 1992) ("<u>**Commonwealth v. Baker II**</u>").* |

---

(8) failure to move to sever Baker's trial from trial of co-defendants;

(9) failure to list as a reason for a new trial objections to the prosecutor's closing argument;

(10) failure to object to the trial court's charge regarding:

(A) the fact that Baker did not testify;

(B) "reasonable doubt";

(C) the verdict report;

(11) failure to request trial court to instruct jury regarding tentative identifications of photographs by Dolan, and to request cautionary instruction regarding Crosby's failure to identify Baker by photograph;

(12) failure to advise Baker of presence of Stanford Saunders on the jury panel;

(13) failure to question prospective jurors concerning their racial bias, and failure to object to prosecutor's striking of qualified black jurors;

(14) advising Baker not to testify in own defense because prosecutor could use Baker's juvenile record to impeach;

(15) failure to investigate and present facts and witnesses during the penalty phase of trial;

(16) failure of counsel to move for a mistrial when co-defendants "pointed" at Baker while their statements were read to jury, and when Detective Ansel looked at Baker and co-defendants while reading redacted statements;

(17) failure to cite testimony of Marcus Angro, the alleged victim of a shooting in a separate incident as a ground for mistrial; and

(18) failure to have Baker included in a hearing regarding the recantation of identification testimony of Calvin Budden, thereby forfeiting Baker's right to confrontation.

5

| | |
|---|---|
| *Date Unknown* | *Baker petitioned for reargument.* |
| *March 2, 1993* | *The Pennsylvania Supreme Court denied Baker's motion for reargument.* |
| *July 30, 1993* | *Baker filed a* pro se *petition for post conviction relief under the Pennsylvania "Post Conviction Relief Act" ("PCRA")[5] ("PCRA petition of 7/30/93").  The petition of 7/30/93 was assigned to the Honorable Joseph Papalini in the Court of Common Pleas of Philadelphia County.* |
| *August 23, 1993* | *Judge Papalini dismissed the petition of 7/30/93 without the appointment of counsel and without conducting a hearing.  Baker appealed.* |
| *December 13, 1993* | *Judge Papalini filed an opinion in support of his August 23, 1993 dismissal of Baker's PCRA petition of 7/30/93.* <u>Commonwealth v. Baker</u>, *No. 514-520 (Pa. Comm. Pl. Ct. Dec. 13, 1993) ("**<u>Commonwealth v. Baker III</u>**").* |
| *Fall 1994* | *The Pennsylvania Supreme Court appointed counsel to represent Baker in the appeal of Judge Papalini's dismissal of Baker's PCRA petition of 7/30/93.* |
| *May 8, 1995* | *The Supreme Court of Pennsylvania affirmed Judge Papalini's dismissal of Baker's PCRA petition of 7/30/93 stating that "the issue raised by Appellant [Baker] was previously litigated on direct appeal to this court, and, thus, Appellant is ineligible for relief under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9543(3), 9544(a)(2)."* <u>Commonwealth v. Baker</u>, *656 A.2d 116 (Pa. 1995) ("**<u>Commonwealth v. Baker IV</u>**").   Baker petitioned the United States Supreme Court for a writ of certiorari.* |
| October 30, 1995 | The U.S. Supreme Court denied certiorari. |
| January 3, 1996 | Baker filed a motion for appointment of counsel and to proceed in forma pauperis in federal court.  The matter was assigned to me for adjudication. |

---

[5]The PCRA is the successor statute to Pennsylvania's Post-Conviction Hearing Act ("PCHA").

January 4, 1996          I granted Baker's IFP motion and appointed Billy H. Nolas
                         as counsel.

*January 15, 1997*          *Baker filed a petition in state court entitled "Petition for*
                         *Habeas Corpus Relief under Article I, Section 14 of the*
                         *Pennsylvania Constitution and for Post-Conviction Relief*
                         *under the Post Conviction Relief Act" ("PCRA petition of*
                         *1/15/97").  The petition was assigned to Judge Sabo.[6]*

_____

[6]Baker's PCRA petition of 1/15/97 contained the following claims for relief:

(1) Erroneous dismissal of Baker's pro se petition for collateral relief (petition of 7/30/93), without the appointment of counsel and an evidentiary hearing, as a second and subsequent petition denied Baker his state and federal rights to due process, state constitutional right to counsel, and all prior counsel were ineffective for failing to object to the treatment of Baker's remand on direct appeal as a PCRA proceeding;

(2) Baker was denied his rights to effective assistance of counsel where trial and appellate counsel failed to conduct a constitutionally adequate investigation and, consequently, failed to discover exculpatory testimony;

(3) Baker was denied due process by trial court's erroneous instruction on accomplice liability permitting jury to find Baker guilty of first degree murder as an accomplice even if it found that he did not possess the requisite mens rea, and all prior counsel were ineffective for failing to raise issue at any prior stage of the proceedings;

(4) Baker was denied his state and federal right not to testify, to due process, and against cruel and unusual punishment when prosecutor engaged in numerous improprieties in closing argument and where trial court took no steps to cure the error;

(5) Baker's right to due process and counsel were violated by the admission of in court identifications of two witnesses, one of whom initially identified another person, then later became sure of his tentative identification of Baker at a suggestive counseless confrontation, and the other initially failed to identify Baker, but later identified him at a suggestive preliminary hearing after the prosecutor had assured defense counsel that the witness would not be asked to make an identification;

(6) Baker was denied his rights to effective assistance of counsel where trial court failed to cross-examine the identification witnesses with their prior inconsistent statements, and where appellate counsel failed to raise this issue on either direct or collateral review;

(7) trial counsel was ineffective for failing to request a cautionary charge requiring jury to treat Dolan's identification with caution, as required under Pennsylvania law;

(8) Baker was denied his rights under the Fifth and Fourteenth Amendments and corresponding provisions of Pennsylvania Constitution where trial court instructed jury that it must draw inference of guilt from fact that Baker did not testify, and Baker was denied his rights to effective assistance of counsel where defense counsel failed to object to unconstitutional instruction, and where appellate counsel failed to raise the issue on direct appeal;

(9) Baker was denied his state and federal constitutional rights to due process where the

trial court failed to instruct the jury that the Commonwealth had the burden of proving each element beyond a reasonable doubt;

(10) Baker was denied his constitutional right to a jury trial and to due process where the trial court erroneously removed the offense of robbery from the jury's consideration by instructing it that the Commonwealth had sufficiently proved that there had been an attempted robbery;

(11) Baker was denied his constitutional rights to confrontation and due process where the prosecutor introduced evidence that an alleged co-conspirator, who was never charged with the crime, refused to speak with the police when interviewed, and Baker was denied the effective assistance of counsel where neither trial nor appellate counsel objected to this testimony or raised the issue;

(12) Baker's capital sentence is unconstitutional because it was based on false and misleading information concerning Baker's prior juvenile record which led the jury to find the aggravating circumstance of "significant history of felony convictions involving the use of threat of violence to the person";

(13) Pennsylvania courts' arbitrary and inconsistent interpretation of "a significant history of felony convictions involving the use or threat if violence to the person" to include ambiguous juvenile adjudications of delinquency for burglary violated due process guarantee of the Fourteenth Amendment, the Eighth Amendment, and corresponding provisions of the Pennsylvania Constitution;

(14) Baker's death sentence violated his Eighth and Fourteenth Amendment rights and the corresponding provisions of the Pennsylvania Constitution where there was insufficient evidence to support jury's finding of the aggravating circumstance of "grave risk to others" and where trial court's instruction on that aggravating circumstance failed to include the limiting constructions on that aggravating circumstance imposed by the Pennsylvania Supreme Court, rendering that aggravating circumstance unconstitutionally vague and overbroad;

(15) Baker was denied his constitutional rights to effective assistance of counsel at penalty phase where trial counsel failed to investigate and prepare for that hearing, and failed to uncover and present relevant mitigating evidence where appellate and post conviction counsel failed to properly investigate and litigate this claim on direct or collateral appeal;

(16) Baker is entitled to relief from his death sentence because the trial court's instructions, which told the jury that its sentencing decision would be reviewed by the Pennsylvania Supreme Court, unconstitutionally diminished the jury's sense of responsibility for its death sentencing decision;

(17) Jury instructions and verdict slip violated the Eighth Amendment, due process clause of the Fourteenth Amendment and the corresponding provisions of the Pennsylvania Constitution because they created the substantial probability that the jury would think that unless it unanimously found a mitigating circumstance, no individual juror could consider that mitigating circumstance in determining the sentence;

(18) Baker was deprived of the individualized sentencing determination to which he was entitled under the Eighth and Fourteenth Amendments as a result of the fact that his penalty phase proceedings were conducted jointly with those of his co-defendants;

8

| | |
|---|---|
| *Prior to March 31, 1997* | *Baker's counsel, Billy Nolas, submitted to Judge Sabo a proposed order without an accompanying motion which stated in part:* |
| | *"[T]he PCRA petition herein [petition of 1/15/97], as supplemented, is dismissed without prejudice due to on-going litigation in federal court."[7]* |
| *March 31, 1997* | *Judge Sabo did not sign Nolas' proposed order but issued his own order dismissing Baker's petition of 1/15/97 "as premature due to on-going litigation in federal court." Commonwealth v. Baker, No. 514-520 (Pa. Ct. Comm. Pl. March 31, 1997) ("***Commonwealth v. Baker V***"***).  The order failed to specify whether the dismissal was with or without prejudice.  The order notified Baker that he had 30 days to appeal the order.* |
| *April 9, 1997* | *Baker filed a motion for rehearing of the petition of 1/15/97 based on newly discovered evidence which Baker contended disclosed a Batson claim.* |
| *April 23, 1997* | Baker filed a petition for writ of *habeas corpus* in federal |

---

(19) Trial court's failure to charge jury that a sentence of life imprisonment would result in Baker's life-long incarceration without possibility of parole, violated Baker's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and the corresponding provisions of the Pennsylvania Constitution;

(20) Counsel was ineffective for failing to raise the issues presented in this petition at trial and in post-trial motions and for failing to litigate these issues either on direct or collateral appeal to the Pennsylvania Supreme Court;

(21) Each of the above bases for relief that were not objected to at trial and/or raised on direct appeal are reviewable on the merits under the relaxed waiver rule in capital cases;

(22) Baker is entitled to relief from his conviction and sentence because of the cumulative effect of the errors described in this petition; and

(23) Baker is entitled to an evidentiary hearing.

[7]According to Nolas, he submitted the proposed order because Judge Sabo had dismissed a PCRA petition of another of Nolas' clients, Otis Peterkin, on the ground that Peterkin was simultaneously litigating his claims in federal court.  Believing Judge Sabo would similarly dismiss Baker's PCRA petition, Nolas hoped to expedite the process.

court under 28 U.S.C. § 2254 ("federal petition of 4/23/97").[8]

_____

[8]Baker's original federal habeas petition contained the following claims:

(1) Baker was denied his rights to effective assistance of counsel where trial and appellate counsel failed to conduct a constitutionally adequate investigation and, consequently, failed to discover exculpatory testimony;

(2) Baker was denied due process by the prosecutor's improper argument both at the guilt and penalty phase of Baker's trial and his trial counsel was constitutionally ineffective for failing to object.

(3) Baker's right to due process and counsel were violated by the admission of in court identifications of two witnesses, one of whom initially identified another person, then later became sure of his tentative identification of Baker at a suggestive counseless confrontation, and the other initially failed to identify Baker, but later identified him at a suggestive preliminary hearing after the prosecutor had assured defense counsel that the witness would not be asked to make an identification;

(4) Baker was denied his rights to effective assistance of counsel where trial counsel failed to cross-examine the identification witnesses with their prior inconsistent statements, and where appellate counsel failed to raise this issue on direct review;

(5) Baker's trial counsel was ineffective for failing to request a cautionary charge requiring the jury to treat Dolan's identification with caution, as required under Pennsylvania law;

(6) Baker was denied due process by the trial court's erroneous instruction on accomplice liability permitting jury to find Baker guilty of first degree murder as an accomplice even if he did not possess the requisite mens rea, and trial and appellate counsel were ineffective for failing to raise the issue at any prior stage of the proceedings;

(7) Baker was denied his rights under the Fifth and Fourteenth Amendments when the trial court instructed the jury that it must draw an inference of guilt from fact that Baker did not testify, and Baker was denied his rights to effective assistance of counsel where defense counsel failed to object to unconstitutional instruction, and where appellate counsel failed to raise the issue on direct appeal;

(8)  Baker was denied due process when the trial court failed to instruct the jury that the Commonwealth had the burden of proving each element of any homicide beyond a reasonable doubt;

(9) Baker was denied his constitutional right to a jury trial and to due process where the trial court erroneously removed the offense of robbery from the jury's consideration by instructing it that the Commonwealth had sufficiently proved that there had been an attempted robbery;

(10) Baker was denied his constitutional rights to confrontation and due process where the prosecutor introduced evidence that an alleged co-conspirator, who was never charged with the crime, refused to speak with the police when interviewed, and Baker was denied the effective assistance of counsel where neither trial nor appellate counsel objected to this testimony or raised the issue;

(11) Baker's capital sentence is unconstitutional because it was based on false and misleading information concerning Baker's prior juvenile record which led the jury to find the aggravating circumstance of "significant history of felony convictions involving the use of threat of violence to the person";

(12) Pennsylvania courts' arbitrary and inconsistent interpretation of "a significant history of felony convictions involving the use or threat if violence to the person" to include ambiguous juvenile adjudications of delinquency for burglary violated due process guarantee of the Fourteenth Amendment and the Eighth Amendment;

(13) Baker's death sentence violated his Sixth, Eighth and Fourteenth Amendment rights and the corresponding provisions of the Pennsylvania Constitution because Pennsylvania's "significant history" of violent felony convictions aggravating circumstance is unconstitutionally vague and overbroad;

(14) Baker's death sentence violated his Eighth and Fourteenth Amendment rights because there was insufficient evidence to support jury's finding of the aggravating circumstance of "grave risk to others" and where trial court's instruction on that aggravating circumstance failed to include the limiting constructions on that aggravating circumstance imposed by the Pennsylvania Supreme Court, rendering that aggravating circumstance unconstitutionally vague and overbroad;

(15) Baker was denied his constitutional rights to effective assistance of counsel at penalty phase where trial counsel failed to investigate and prepare for that hearing, and failed to uncover and present relevant mitigating evidence and appellate counsel failed to properly investigate and litigate this claim on direct appeal;

(16) Baker is entitled to relief from his death sentence because the trial court's instructions, which told the jury that its sentencing decision would be reviewed by the Pennsylvania Supreme Court, unconstitutionally diminished the jury's sense of responsibility for its death sentencing decision;

(17) Jury instructions and verdict slip violated the Eighth Amendment, due process clause of the Fourteenth Amendment and the corresponding provisions of the Pennsylvania Constitution because they created the substantial probability that the jury would think that unless it unanimously found a mitigating circumstance, no individual juror could consider that mitigating circumstance in determining the sentence;

(18) Baker was deprived of the individualized sentencing determination to which he was entitled under the Eighth and Fourteenth Amendments as a result of the fact that his penalty phase proceedings were conducted jointly with those of his co-defendants;

(19) Baker's was denied his rights under the Sixth, Eighth, and Fourteenth Amendments when the Commonwealth used its peremptory strikes in a racially discriminatory manner;

(20) Trial court's failure to charge jury that a sentence of life imprisonment would result in Baker's life-long incarceration without possibility of parole, violated Baker's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and the corresponding provisions of the Pennsylvania Constitution;

(21) The erroneous dismissal of Baker's PCRA petition of 7/30/93 prior to the appointment of counsel and an evidentiary hearing denied Baker his federal constitutional rights

| | |
|---|---|
| *April 25, 1997* | *Baker appealed to the Pennsylvania Supreme Court Judge Sabo's March 31, 1997 dismissal of Baker's PCRA petition of 1/15/97.* |
| *May 7, 1997* | *Judge Sabo issued an opinion in support of his March 31, 1997 order dismissing Baker's PCRA petition of 1/15/97. Commonwealth v. Baker, No. 514-520 (Pa. Ct. Comm. Pl. May 7, 1997) ("**Commonwealth v. Baker VI**"). It stated in part:* |

*"The Petition was initially dismissed at the request of defense counsel as being premature due to on-going litigation in federal court...Even if this action were not barred by federal litigation...the action would still not meet the requisites for relief under the Post-Conviction Relief Act. The defendant himself acknowledges that there have been multiple filings under the Post Conviction Relief Act in this case. Guided by governing criteria set forth in Commonwealth v. Lawson, 519 Pa. 504, 549 A.2d 107 (1988) for repetitive filings, the Court finds that the Defendant has failed to set forth a strong prima facie case that a miscarriage of justice occurred."*

*Judge Sabo also denied Baker's April 9, 1997 motion for rehearing based on the Batson claim.*

| | |
|---|---|
| *May 14, 1997* | *Baker filed a petition for reconsideration of Judge Sabo's May 7, 1997 opinion. Baker argued that he had not requested dismissal of his petition and that Judge Sabo had misunderstood the intention of Baker's counsel in submitting the proposed order of dismissal.* |
| *June 5, 1997* | *Baker appealed Judge Sabo's May 7, 1997 opinion to the* |

to due process and all prior counsel were constitutionally ineffective for failing to object to the treatment of Baker's remand on direct appeal as a PCRA proceeding;

(22) Trial and appellate counsel were constitutionally ineffective for failing to raise the issues presented in this petition at trial, in post-trial motions, and on direct appeal to the Pennsylvania Supreme Court; and

(23) Baker is entitled to relief from his conviction and sentence because of the cumulative effect of the errors described in this petition.

*Pennsylvania Supreme Court.*

*August 28, 1997*

*In response to Baker's June 5, 1997 appeal, Judge Sabo issued another opinion in which he stated that he was "without understanding as to how a party who has already filed an appeal in an action can file a totally separate appeal from a denial of reconsideration involving the very same action."* Commonwealth v. Baker, *No. 514-520 (Pa. Ct. Comm. Pl. Aug. 28, 1997) ("__**Commonwealth v. Baker VII**__").*

*Judge Sabo also noted that Baker's May 14, 1997 petition for reconsideration was untimely because it was filed more than 30 days after Judge Sabo had dismissed the case in the order of* Commonwealth v. Baker V.

October 17, 1997

The Commonwealth filed a "motion for adjudication of issues of exhaustion and procedural default" in federal court.

According to the Commonwealth, Baker's federal habeas petition was a "mixed petition," containing claims that had not been exhausted in state court. The Commonwealth argued that the unexhausted claims were procedurally defaulted because they were time-barred under state law. As a result, the Commonwealth contended, the unexhausted claims were unreviewable in federal court.

In the alternative, the Commonwealth argued that if Baker's unexhausted claims were not procedurally defaulted in state court, his federal petition must be dismissed for failure to exhaust state remedies.

November 10, 1997

Baker responded to the Commonwealth's motion for adjudication of issues of exhaustion and procedural default. Baker conceded that at least one of the claims in his federal petition was unexhausted in state court. However, Baker argued that any unexhausted claims were not procedurally defaulted in state court. Baker presented me with three options for how to proceed: (1) I could dismiss the petition without prejudice for failure to exhaust; (2) the Commonwealth could waive exhaustion, and permit review of the petition as filed; or (3) I could hold the federal case in abeyance while Baker exhausted his claims in state court.

13

| | |
|---|---|
| November 18, 1997 | The Commonwealth informed Baker's counsel by letter that it would not waive the exhaustion requirement for any claim in Baker's federal petition of 4/23/97. |
| December 22, 1997 | I issued an order in which I (1) found that none of the unexhausted claims in Baker's federal petition of 4/23/97 were procedurally defaulted in state court, and (2) dismissed Baker's petition without prejudice for failure to exhaust state remedies.  (Order and Explanation, Dec. 22, 1997 ("**Baker v. Horn I**")). |

---

| | |
|---|---|
| *January 21, 1998* | *While Baker's appeal of Judge Sabo's dismissal of the PCRA petition of 1/15/97 was pending before the Pennsylvania Supreme Court, Baker moved the Pennsylvania Supreme Court to compel the Commonwealth to file a complete record, to remand for proceedings in the lower court, and/or for an extension of time in which to file his brief.* |
| *January 29, 1998* | *In response, the Commonwealth filed with the Pennsylvania Supreme Court (1) an answer "to [Baker's] moot and frivolous motion to compel," and (2) a "motion for summary disposition of appeal from time-barred third PCRA petition."* |
| *February 17, 1998* | *Baker filed an answer to the Commonwealth's motion for summary disposition.* |
| *February 20, 1998* | *The Pennsylvania Supreme Court issued an order (1) denying Baker's request to compel the Commonwealth or the clerk of the lower court to file a complete record; (2) denying Baker's request to remand; and (3) granting Baker's request for an extension of time to file his brief.* |
| *July 24, 1998* | *Baker alleges that he attempted to file in the Court of Common Pleas a "Motion for New Trial Based on Newly Discovered Evidence and Petition for Habeas Corpus Relief."   The filing would have introduced evidence derived from a recently released academic study of racial discrimination in capital cases in Philadelphia.  Baker contends the Court of Common Pleas refused to accept the motion for filing.* |

July 31, 1998
In federal court, Baker filed a Rule 60(b) motion[9] for relief from the December 22, 1997 dismissal of his federal petition of 4/23/97.  Baker argued that the dismissal could have the effect of precluding him from filing an amended habeas corpus petition after he had exhausted his state remedies.  According to Baker, his federal statute of limitations could expire before his claims were exhausted in state court.  Therefore, Baker asked that (1) I vacate the order of 12/22/97 dismissing his mixed petition without prejudice, and (2) I hold his case in abeyance pending the outcome of the state court disposition of his PCRA petition of 1/15/97.

*August 17, 1998*
*Baker filed in the Pennsylvania Supreme Court an "Application for Permission to File Supplemental Pleading and Motion to Remand to the PCHA Court on the Basis of Newly Discovered Evidence."  The motion incorporated verbatim the arguments presented in the July 24, 1998 motion Baker attempted to file in the Court of Pleas.*

November 16, 1998
I issued an order clarifying the December 22, 1997 order dismissing Baker's federal petition of 4/23/97 without prejudice:

"This Court's order of December 22, 1997 [dismissing Baker's petition without prejudice] is clarified to reflect that Petitioner's writ of Habeas Corpus was dismissed without prejudice to Petitioner's right to file an amended petition pursuant to Federal Rule of Civil Procedure 15(c)(2) upon exhaustion of his state remedies.

---

[9]Federal Rule of Civil Procedure 60(b) provides, in part:

**b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc.** On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect...or (6) any other reason justifying relief from the operation of the judgment.

Fed.R.Civ.P. 60(b).

This order is effective <u>nunc</u> <u>pro</u> <u>tunc</u> to the time of this Court's December 22, 1997 order."

(Order, Nov. 16, 1998 ("**Baker v. Horn II**")).

December 11, 1998    Baker filed an application for certificate of appealability of my November 16, 1998 clarification order.  On this same date, Baker filed a notice of appeal with the Third Circuit.

February 23, 1999    I denied Baker's application for a certificate of appealability.

*May 4, 1999*    *The Supreme Court of Pennsylvania in* <u>Commonwealth v. Baker</u>, *556 Pa. 427, 728 A.2d 952 (Pa. 1999) ("**Commonwealth v. Baker VIII**"), affirmed Judge Sabo's March 31, 1997 dismissal of Baker's PCRA petition of 1/15/97:*

"*The rules of criminal procedure allow a party to 'withdraw a petition for post-conviction collateral relief at any time.'  Pa.R.Crim.P. 1505.  We cannot, therefore, rule that it was error to grant [Baker's] request for a dismissal...*

*Appellant's brief also lists 23 other alleged errors.  Due to Appellant's requested dismissal, none of these issues were litigated before the common pleas court and thus, no record has been developed for this Court to review. It is a general rule that, '[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal.' Pa.R.A.P. 302. Therefore, we do not reach the merits of these issues.*"

<u>Commonwealth v. Baker VIII</u>, *728 A.2d at 953.*

*The Pennsylvania Supreme Court's opinion was accompanied by an order which stated, in part:*

"*AND NOW, this 4th day of May, 1999, Appellee's [the Commonwealth's] Motion for Summary Disposition of Appeal from Time-Barred Third PCRA Petition is denied.*"

*May 14, 1999*    *Baker filed an application for reargument before the*

16

*Pennsylvania Supreme Court.*

June 25, 1999                    Baker filed a "notice to reopen habeas corpus case" and an
                                amended federal petition for writ of *habeas corpus*
                                ("federal petition of 6/25/99") in federal court.[10]

_____

[10]Baker's amended federal habeas petition contains the following claims for relief:

(1) Baker's capital sentence is unconstitutional because it was based on false and misleading information concerning Baker's prior juvenile record;

(2) Baker was denied the effective assistance of counsel at capital sentencing where trial counsel failed to investigate, develop and present compelling mitigating evidence;

(3) Baker is entitled to relief from his conviction and sentence because counsel ineffectively failed to conduct a constitutionally adequate investigation and the prosecution withheld exculpatory evidence, resulting in the failure of the defense to discover or present the exculpatory testimony of a known eyewitness;

(4) Baker is entitled to relief from his conviction and sentence because the trial court's erroneous instructions on accomplice liability permitted the jury to find Baker guilty of first degree murder as an accomplice even if he did not possess the specific intent to kill that is an element of the offense;

(5) Baker is entitled to relief from his death sentence because the penalty phase jury instructions and verdict sheet unconstitutionally indicated that the jury had to unanimously find any mitigating circumstance before it could give effect to that circumstance in its sentencing decision.

(6) Baker's death sentence should be vacated because the arbitrary "proportionality review" performed by the Pennsylvania Supreme Court violated his right to due process and denied him meaningful appellate review of death penalty cases constitutionally mandated by the Eighth and Fourteenth Amendments;

(7) Baker is entitled to relief from his conviction and sentence because of the improper admission of in-court identifications by two witnesses;

(8) Baker was denied his right to effective assistance of counsel where trial counsel failed to cross examine the identification witnesses with their prior inconsistent statements;

(9) Baker's counsel was ineffective for failing to request a cautionary charge requiring the jury to treat Mr. Dolan's identification with caution, a charge which was mandatory under Pennsylvania law;

(10) Baker is entitled to relief from his death sentence because the arbitrary, inconsistent and unprincipled broadening of the (D)(9) aggravating circumstance – "felony convictions involving the use or threat of violence to the person" – to include non-violent burglary convictions and juvenile adjudications of delinquency deprived Baker of his rights under the Eighth and Fourteenth Amendments to the United States Constitution;

(11) Baker is entitled to relief from his conviction and sentence because of improper prosecutorial argument;

(12) Baker is entitled to relief from his conviction and sentence because the Commonwealth discriminated against African-American venirepersons in its exercise of

peremptory jury challenges in violation fo the Sixth, Eighth and Fourteenth Amendments to the United States Constitution;

(13) Baker's death sentence was a product of improper racial discrimination and violates the United States Constitution;

(14) Baker is entitled to relief from his death sentence because there was insufficient evidence to support the jury's finding of the (D)(7) "grave risk of death to another" aggravating circumstance, and the trial court's instruction on that aggravating circumstance failed to include the limiting construction imposed by the Pennsylvania Supreme Court, rendering the (D)(7) aggravating circumstance unconstitutionally vague and overbroad;

(15) Baker is entitled to relief from his death sentence because Pennsylvania's (d)(9) "significant history" of violent felony convictions aggravating circumstance is unconstitutionally vague in violation of the Eighth and Fourteenth Amendments;

(16) Baker is entitled to relief from his death sentence because the trial court's instructions, which told the jury that their sentencing decision would be reviewed by the Pennsylvania Supreme Court, unconstitutionally diminished the jury's sense of responsibility for its death sentencing decision;

(17) Baker is entitled to relief from his conviction and sentence because the trial court instructed the jury that it should draw an inference of guilt from the fact that petitioner did not testify;

(18) Baker was denied his due process rights where the trial court failed to instruct that the Commonwealth had the burden of proving each and every element of any homicide offense beyond a reasonable doubt;

(19) Baker is entitled to relief from his robbery conviction and his death sentence because the trial court directed a verdict in favor of the Commonwealth on robbery;

(20) Baker was denied his constitutional rights to confrontation and due process when the prosecutor introduced evidence that an alleged coconspirator, who was never charged with the crime, refused to speak with the police when interviewed;

(21) Baker was denied the individualized sentencing determination to which he was entitled under the Eighth and Fourteenth Amendments as a result of the fact that his penalty phase proceedings were conducted jointly with those of his codefendants;

(22) Baker's death sentence should be vacated because the sentencing jury was never instructed that, if sentenced to life, he would be statutorily ineligible for parole;

(23) The erroneous dismissal of Baker's first pro se petition for state post-conviction collateral relief as supposedly being a second petition, without the appointment of counsel and an evidentiary hearing, denied Baker his federal constitutional rights to due process, and all prior counsel were ineffective for failing to object to the treatment of Baker's remand on direct appeal as a PCRA proceeding or otherwise challenge the improper treatment of Baker's collateral attack;

(24) Trial and appellate counsel were ineffective for failing to raise the issues presented in this petition at trial and in post-trial motions; and for failing properly to litigate these issues on direct appeal to the Pennsylvania Supreme Court; and

(25) Baker is entitled to a new trial and sentencing proceeding because the prejudicial

18

| | |
|---|---|
| August 18, 1999 | I issued an order that I would take no further action in the case because Baker's appeal of my November 16, 1998 order was still pending before the Third Circuit. |
| *February 1, 2000* | *The Pennsylvania Supreme Court denied Baker's application for reargument of its May 4, 1999 memorandum & order affirming the dismissal of Baker's PCRA petition of 1/15/97.* |
| July 18, 2000 | Baker filed a petition to withdraw his appeal from the Third Circuit. |
| August 9, 2000 | The Third Circuit granted Baker's petition and terminated the appeal. |
| October 26, 2000 | I granted Baker's motion "to reopen habeas corpus case." |
| August 31, 2001 | The Commonwealth filed a "motion to dismiss [Baker's] amended [federal] petition as untimely, or, in the alternative, motion to dismiss all claims in the amended [federal] petition that are not reviewable under federal habeas law." |
| May 31, 2002 | I denied the Commonwealth's motion to dismiss in <u>Baker v. Horn</u>, 210 F. Supp. 2d 592 (E.D.Pa. 2002) ("**Baker v. Horn III**").  I explained that the claims presented in Baker's PCRA petition of 1/15/97, as well as two other claims contained within his federal petition, were exhausted and were not procedurally defaulted.  However, I deferred consideration of the procedural posture of Baker's <u>Batson</u>-related claims. |
| July 25, 2002 | Baker filed a motion for summary judgment on his claim challenging the accomplice liability instructions.  He argued that he was entitled to relief under the Third Circuit's decisions in <u>Everett v. Beard</u>, 290 F.3d 500 (3d Cir. 2002) and <u>Smith v. Horn</u>, 120 F.3d 400 (3d Cir. 1997) and that the granting of summary relief on this claim "would make it unnecessary for the court to devote |

_____

effects of the cumulative errors in this case undermine confidence in the outcome at both stages of trial.

|                   |                                                                                                                                                                                                                                  |
|-------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                   | additional resources to deciding the other claims in this case."                                                                                                                                                                   |
| January 14, 2003  | I issued an order denying Baker's motion for summary judgment "without prejudice to raise along with <u>all</u> of the other claims in his petition" and ordering Baker to submit a brief regarding all of the claims in his petition. |
| May 8, 2003       | Baker filed a memorandum of law in support of his amended petition for habeas corpus.                                                                                                                                              |
| March 5, 2004     | The Commonwealth filed a response memorandum in opposition to Baker's petition for habeas corpus.                                                                                                                                  |
| July 6, 2004      | Baker filed a reply brief in support of his petition for habeas corpus.                                                                                                                                                            |

Because a good deal of time has passed since I issued <u>Baker v. Horn III</u>, I will review its

analytical steps in light of subsequent authority to evaluate its continuing vitality.

## B.  Application of AEDPA

As I noted in <u>Baker v. Horn III</u>, revisions to the federal habeas statute enacted in the Anti-

Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-32, 110 Stat. 1214 (1996),

effective April 24, 1996 ("AEDPA"), apply to Baker's federal petition.  <u>Baker v. Horn III</u>, 210 F.

Supp. 2d at 603-06.  Baker filed a motion for appointment of counsel in federal court on January

3, 1996, prior to the effective date of the AEDPA, but he did not file his original habeas petition

until April 23, 1997 and his amended petition until June 25, 1999, both after the AEDPA's

effective date.  The Supreme Court's opinion in <u>Woodford v. Garceau</u>, 538 U.S. 202 (2003),

leaves no doubt that the AEPDA properly applies to Baker's federal petition.  In <u>Woodford</u>, the

Supreme Court stated that "an application [for habeas relief] filed after AEDPA's effective date

should be reviewed under the AEDPA, even if other filings by that same applicant–such as, for

example, a request for the appointment of counsel. . .–were presented to a federal court prior to AEDPA's effective date." Id. at 207.  Even though Baker had previously filed a motion for appointment of counsel, Baker's actual petition for habeas corpus was not pending in federal court on the AEDPA's effective date; therefore, the petition must be reviewed pursuant to the AEDPA. Id.

**C.  AEDPA Timeliness**

**1.  Background**

Baker filed his original federal habeas petition on April 23, 1997.  Over Baker's objections, I dismissed that original petition "without prejudice" on December 22, 1997 as a "mixed" petition containing both exhausted and unexhausted claims.  (Order and Explanation, Dec. 22, 1997 ("Baker v. Horn I").)  I also denied Baker's request to hold his case in abeyance while he litigated his unexhausted claims in state court.[11]  Id.  Baker, fearing that a subsequent federal habeas petition might be time-barred, filed a subsequent motion requesting that the order be vacated and that his case be placed in suspense pending the exhaustion of his state court remedies.  By order dated November 16, 1998, I attempted to clarify that the dismissal of Baker's original federal petition was without prejudice to Baker's right to file an amended federal petition pursuant to Federal Rule of Civil Procedure 15(c)(2), concerning relation back of amendments to pleadings.  (Order, Nov. 16, 1998 ("Baker v. Horn II").)

At the time of the dismissal of Baker's original federal petition in federal court, Baker v.

---

[11]As explained infra, at the time I believed those decisions to be required by governing Supreme Court and Third Circuit precedent, but the Supreme Court has since clarified that, under the circumstances of the case, it would have been entirely proper to hold Baker's case in abeyance while he litigated his unexhausted claims in state court.  See Rhines v. Weber, 125 S. Ct. 1528, 1531 (2005); Pace v. DiGuglielmo, 125 S. Ct. 1807, 1813-14 (2005).

Horn I, Baker was in the midst of litigating a PCRA petition he had filed on January 15, 1997 in the Pennsylvania courts ("PCRA petition of 1/15/97"). On March 31, 1997, the PCRA court dismissed that petition "as premature due to on-going litigation in federal court," Commonwealth v. Baker, No. 514-520 (Pa. Ct. Comm. Pl. March 31, 1997) ("Commonwealth v. Baker V"), but in a later opinion stated that the petition had been "initially dismissed at the request of defense counsel." Commonwealth v. Baker, No. 514-520 (Pa. Ct. Comm. Pl. May 7, 1997) ("Commonwealth v. Baker VI"). Baker timely appealed both the Commonwealth v. Baker V order and subsequent opinion, Commonwealth v. Baker VI. On May 4, 1999, the Pennsylvania Supreme Court affirmed the PCRA court's dismissal on the ground that Baker had requested that the PCRA court dismiss his petition. Commonwealth v. Baker, 556 Pa. 427, 728 A.2d 952 (Pa. 1999) ("Commonwealth v. Baker VIII"). Shortly thereafter, Baker filed an application for reargument with the Pennsylvania Supreme Court that was ultimately denied on February 1, 2000. On June 25, 1999, while the application for reargument was pending in state court, Baker filed a motion to reopen habeas case and an amended habeas petition in federal court.

The AEDPA establishes a one-year statute of limitations for filing a federal habeas corpus petition. 28 U.S.C. § 2244(d)(1). As explained in Baker v. Horn III, because Baker's state conviction became final prior to the effective date of the AEDPA, Baker's AEDPA limitations period began to run on the effective date of the Act, April 24, 1996. 210 F. Supp. 2d at 607. Absent tolling, the limitations period therefore would have expired on April 23, 1997. Id. at 620. Baker filed his original federal habeas petition on April 23, 1997 and it therefore was timely filed. However, as noted, I dismissed that petition in Baker v. Horn I. Baker's amended federal petition was filed on June 25, 1999, more than three years after the date his AEDPA limitations

22

period began to run.  I concluded in <u>Baker v. Horn III</u> that Baker's amended federal petition was nevertheless timely filed because: 1) the PCRA petition of 1/15/97 statutorily tolled his AEDPA limitations period under 28 U.S.C. § 2244(d)(2); and, in the alternative, 2) the AEDPA limitations period should be equitably tolled based upon the PCRA petition of 1/15/97 and all of the circumstances surrounding his efforts to present his claims in state and federal court.[12]

### 2.  Statutory Tolling

Section 2244(d)(2) provides that a "properly filed application for State post-conviction relief or other collateral review" tolls section 2244(d)(1)'s one-year limitations period for the time during which the properly filed application is "pending."  28 U.S.C. § 2244(d)(2). I concluded in <u>Baker v. Horn III</u> that Baker's PCRA petition of 1/15/97 was "properly filed" and that it was "pending" from the date of its filing until February 1, 2000, the date the Pennsylvania Supreme Court denied Baker's application for reargument.  210 F. Supp. 2d at 610-20.  <u>Baker v. Horn III</u> must be reviewed to evaluate its continuing vitality in light of the United States Supreme Court's subsequent decisions in <u>Carey v. Saffold</u>, 536 U.S. 214 (2002) and <u>Pace v. DiGuglielmo</u>, 125 S. Ct. 1807, 1813-14 (2005), which discussed both statutory and equitable tolling under the AEDPA, as well as in light of subsequent cases decided by the Pennsylvania Supreme Court.

A state application for postconviction relief is "'properly filed' when its delivery and acceptance are in compliance with the applicable [state] laws and rules governing filings."  <u>Artuz v. Bennett</u>, 531 U.S. 4, 8 (2000).  State-imposed time limits on postconviction petitions are

---

[12]I noted in <u>Baker v. Horn III</u> that the Third Circuit's decisions in <u>Banks v. Horn</u>, 271 F.3d 527 (3d Cir. 2001), and <u>Jones v. Morton</u>, 195 F.3d 153, 160-61 (3d Cir. 1999), required the conclusion that the amended federal petition could not relate back to Baker's previously dismissed original federal habeas petition.  <u>Baker v. Horn III</u>, 210 F. Supp. 2d at 609-10.

"condition[s] to filing," such that untimely petitions are not deemed "properly filed" for purposes of section 2244(d)(2).  Pace, 125 S. Ct. at 1814.  If a state court has rejected a postconviction petition as untimely under state law, the petition was not "properly filed," and the petitioner cannot be entitled to statutory tolling under § 2244(d)(2).  Id.  On the other hand, when a state court has not "clearly ruled" on the timeliness of a state petition, it is the responsibility of the habeas court to consider whether the state postconviction petition was timely filed as a matter of state law before tolling the AEDPA limitations period.  Carey v. Saffold, 536 U.S. 214, 226-27 (2002) (remanding federal petition to Ninth Circuit, when California courts had not clearly ruled on timeliness of state petition, for consideration of whether state petition timely as matter of California law and consequently "properly filed" for purposes of AEDPA statutory tolling).

In Baker v. Horn III, which I issued shortly before the United States Supreme Court's decision in Saffold, I concluded that Baker's PCRA petition of 1/15/97 was "properly filed" under section 2244(d)(2).  210 F. Supp. 2d at 610-19.  I reached that conclusion without squarely addressing whether Baker's PCRA petition of 1/15/97 was timely filed as a matter of Pennsylvania law.  Id.  I noted that Baker had presented at least a plausible argument that his PCRA petition of 1/15/97 was timely.  Id. at 614-15 n.17.  I also noted that the Pennsylvania Supreme Court did not reject Baker's PCRA petition of 1/15/97 as untimely.  Id. at 615-19.  Finally, I noted that the Pennsylvania Supreme Court had "implicitly" ruled that Baker's petition was timely when it denied the Commonwealth's motion for summary disposition of Baker's PCRA petition of 1/15/97 as untimely and requested full briefing on the merits of Baker's petition.  Id. at 616-17.  I concluded as follows:

> Given the fact that Baker's petition of 1/15/97 could have been
> timely under 9545(b)'s one-year grace period if it were treated as

24

> his first petition, I decline to conclude what the Pennsylvania
> Supreme Court never did–that Baker's petition of 1/15/97 was
> untimely under Pennsylvania law.

Id. at 617.

The United States Supreme Court subsequently clarified in <u>Saffold</u> that a federal habeas court must not construe a state court's decision to look past timeliness concerns and base its decision on a separate ground as an implicit ruling of timeliness.  536 U.S. at 225-26. In <u>Saffold</u>, the petitioner, Saffold, before filing his federal habeas petition, had filed "original" state habeas petitions in the state trial court, the State Court of Appeal, and the California Supreme Court.  Id. at 217.  Under California's unusual "original writ" system of postconviction review, a prisoner ordinarily would first file an original state habeas petition in a lower state court.  Id. at 221.  In the event that the first petition is denied, the prisoner, rather than directly appealing that denial to a higher court, would refile the petition as an "original" petition in a higher court.  Id. at 222.  The United States Supreme Court in <u>Saffold</u> viewed the filing of such subsequent "original" petitions in California courts as analogous to the direct review process available in most other states.  Id. at 223.  However, a critical difference between California's system and that of other states is that rather than providing clear time limits for the filing of an appeal, California courts judge the timeliness of subsequent "original" petitions filed in higher courts under a more general standard of "reasonableness."  Id. at 221-23.

Saffold filed his "original" petition in the California Supreme Court four and one-half months after the State Court of Appeal had dismissed his prior petition.  Id. at 217.  The California Supreme Court denied the petition filed in the state Supreme Court, stating in a single sentence that it did so "on the merits and for lack of diligence."  Id. at 217-18.

25

All federal courts reviewing Saffold's federal habeas petition ruled that Saffold's federal petition would be timely through operation of the AEDPA's statutory tolling provision only if his state application for review was "pending" during the intervals between his successive filings in the California courts. Id. at 218. The United States Supreme Court further ruled that Saffold's application could not be considered "pending" under federal law, if he did not timely file his petition before the California Supreme Court as a matter of California law. Id. at 225.

The Ninth Circuit had reasoned that the California Supreme Court's decision to deny Saffold's state petition "on the merits" constituted an implicit ruling that Saffold had not delayed unreasonably in filing his state petition and that the state petition was therefore timely. Id. It did not undertake its own independent inquiry as to whether the delay was reasonable and the state petition therefore timely under California law.

The United States Supreme Court disagreed with this procedure. It noted that "there are many plausible answers" for why a state court might "address the merits of a claim that it believes was presented in an untimely way." Id. The Court stated:

> If the California Supreme Court had clearly ruled that Saffold's 4 1/2-month delay was "unreasonable," that would be the end of the matter, regardless of whether it also addressed the merits of the claim, or whether its timeliness ruling was "entangled" with the merits.

Id. at 226.[13] But because the California Supreme Court had not "clearly ruled" as to the timeliness of the state petition, the United States Supreme Court remanded the case back to the

---

[13]The implicit corollary is that had the California Supreme Court clearly ruled that the state petition was timely under California law, that determination would also be conclusive.

Ninth Circuit for consideration of timeliness as a matter of California law.[14]  Id. at 226-27.

_____

[14]On remand, the Ninth Circuit first ordered the case remanded to the district court for an evidentiary hearing and a determination of:

> . . . whether Saffold filed his original habeas petition in the California Supreme Court "within a reasonable time after [he] knew, or with due diligence should have known, the facts underlying the claim as well as the legal basis for the claim." In re Harris, 5 Cal. 4th 813, 21 Cal. Rptr. 2d 373, 855 P.2d 391, 398 n.7 (Cal. 1993).  As the Supreme Court observed in Saffold[], "[i]f the California Supreme Court had clearly ruled that Saffold's 4-month delay was 'unreasonable,' that would be the end of the matter."  But the California Court did not make such a clear ruling.  We accordingly ask the district court to determine whether Saffold's petition met the California standard set forth in Harris.

Saffold v. Carey, 295 F.3d 1024, 1025 (9th Cir. 2002), withdrawn by Saffold v. Carey, 295 F.3d 1380 (9th Cir. 2002).

The Ninth Circuit later reconsidered and withdrew that order to remand.  After Saffold presented the court with other orders in which the California Supreme Court reviewed the merits of petitions filed more than four and one-half months after the denial of a previous petition by a lower court, the Ninth Circuit ruled:

> The Supreme Court held that Saffold's petition was pending until the California Supreme Court denied it–provided he did not unreasonably delay in filing his petition.  This holding, when viewed in light of the California Supreme Court's orders denying on the merits petitions that were far more tardy than Saffold's, compels the conclusion that Saffold's petition was not denied as untimely by the California Supreme Court, that he is entitled to tolling for the four and one-half month period in question, and that his federal habeas petition should be reviewed on the merits by the district court.

Saffold v. Carey, 312 F.3d 1031, 1035-36 (9th Cir. 2002).  Thus, the Ninth Circuit, despite the Supreme Court's ruling in Saffold, continues to view the relevant inquiry as "whether the state court denied the petition as untimely" and construes a failure of the state courts to deny a petition as untimely as a conclusive ruling of timeliness.  See Chavis v. LeMarque, 382 F.3d 921, 925-26 (9th Cir. 2004), cert. granted, 125 S.Ct. 1969 (2005); Gaston v. Palmer, No. 01-56367, 2005 WL 1803261 (9th Cir. Aug 02, 2005) ("On remand from the Supreme Court in Saffold, we held that the timeliness of a California state habeas application depends entirely on California law. That is, our determination of whether a California applicant sought habeas relief in a timely fashion is governed by whether the California courts have dismissed his applications as untimely.")

The Supreme Court has seemingly clarified the question by stating clearly in Pace:

> What we intimated in Saffold we now hold: When a postconviction petition is untimely under state law, "that [is] the end of the

Thus, even though the Pennsylvania Supreme Court declined to dispose of Baker's case on timeliness grounds, instead dismissing it on the ground that Baker had withdrawn his petition, such treatment does not constitute an implicit ruling that Baker's petition was timely. As the Supreme Court noted in <u>Saffold</u>, "there are many plausible reasons" why a state court might decline to base a decision on timeliness when another ground is available. <u>Id.</u> This may be especially true when a state court is able to dispose of the case without otherwise reaching its merits. As the Supreme Court stated recently in <u>Pace</u>, "When a postconviction petition is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)." 125 S. Ct. at 1812; <u>see also</u> <u>Merritt v. Blaine</u>, 326 F.3d 157, 167 (3d Cir. 2003) ("[W]e must look to state law to determine whether the state petition is 'properly filed.'"); <u>Fahy v. Horn</u>, 240 F.3d 239, 243-44 (3d Cir. 2001) ("The AEDPA['s statutory tolling provision] requires us to interpret state law as we do when sitting in diversity cases.")  Because the Pennsylvania Supreme Court never "clearly ruled" as to whether Baker's PCRA petition of 1/15/97 was untimely under state law, I must consider whether it was timely filed as a matter of Pennsylvania law before deeming it "properly filed" and a basis for statutory tolling under § 2244(d)(2).

At the time Baker filed his PCRA petition of 1/15/97, absent certain exceptions, petitioners were generally required to file PCRA petitions within one year of their final judgment of conviction.  42 Pa. Cons. Stat. Ann. § 9545(b) (1998).  Amendments to the PCRA enacted in

---

matter" for purposes of § 2244(d)(2).

125 S. Ct. at 1812.  Further, the Supreme Court has granted certiorari to consider the Ninth Circuit's view that the California Supreme Court's failure to dismiss a state petition as untimely amounts to a dispositive determination that the petition was timely under California law. <u>LaMarque v. Chavis</u>, 125 S.Ct. 1969 (2005).  In the meantime, the Ninth Circuit's puzzling interpretation of the Supreme Court's ruling in <u>Saffold</u> is, of course, not binding in this circuit.

1995 provided that:

> Any petition under [the PCRA], including a second or subsequent
> petition, shall be filed within one year of the date the judgment
> becomes final, unless the petition alleges and the petitioner proves
> that [he or she qualifies for one of three exceptions].

42 Pa. Cons. Stat. Ann. §9545(b).

Petitioners whose convictions became final prior to the effective date of the 1995

amendments, January 16, 1996, were permitted to file a "first" PCRA petition by January 16,

1997 and have it be treated as timely. 42 Pa. Cons. Stat. Ann. § 9545, Historical and Statutory

Notes; Act of November 17, 1995, P.L. 1118, No. 32 (Spec. Sess. No. 1), § 3(1) ("section 3(1)").

Section 3(1) provided that the 1995 amendments, including the one-year statute of limitations:

> shall apply to petitions filed after the effective date of this act
> [January 16, 1996]; however, a petitioner whose judgment has
> become final on or before the effective date of this act shall be
> deemed to have filed a timely petition under [the PCRA] if the
> petitioner's first petition is filed within one year of the effective
> date of this act.

Section 3(1).

Baker's PCRA petition of 1/15/97 was filed before January 16, 1997, but it was not

chronologically his first petition, as he had previously filed petitions under both the Post-

Conviction Hearing Act, 42 Pa. Cons. Stat. §§ 9541-9551 (superseded) ("PCHA"), and the

PCRA.  He filed a counseled PCHA petition on April 10, 1987, following the Supreme Court's

remand of his direct appeal proceedings, and subsequently filed a pro se PCRA petition on July

30, 1993.

Baker argues that section 3(1)'s grace period for first petitions should be read to allow a

grace period for the first counseled petition a petitioner files after the conclusion of one full

round of direct review.  Under Baker's interpretation, a petition that was uncounseled or a petition filed before the conclusion of direct review does not count as a "first" petition for purposes of section 3(1)'s grace period.  Consequently, even if a petitioner had filed a previous uncounseled petition, or a previous counseled petition prior to the conclusion of direct review, under Baker's theory, the petitioner would still be permitted to file a "first" counseled petition before January 16, 1997 and have it be deemed timely under section 3(1).  Baker's PCHA petition of 4/10/87 was filed prior to the conclusion of direct review and his PCRA petition of 7/30/93 was uncounseled.  Therefore, according to Baker, Baker's PCRA petition of 1/15/97 was Baker's first counseled petition filed after the conclusion of direct review and was timely.

Baker is correct that the Pennsylvania Supreme Court interprets PCRA's timeliness requirements in concert with a traditional and statutory right to the assistance of counsel in Pennsylvania postconviction proceedings.  Commonwealth v. Tedford, 781 A.2d 1167, 1170-71 (Pa. 2001); Commonwealth v. Smith, 818 A.2d 494, 501 (Pa. 2003); Pa. R. Crim. P. 904.  The Pennsylvania Supreme Court has explained that "if a court dismisses a pro se petition prior to the appointment of counsel, a subsequent petition may not be treated as an untimely second petition."  Commonwealth v. Williams, 828 A.2d 981, 990 (Pa. 2003); see also Tedford, 781 A.2d at 1171 (when petitioner's previous pro se PCRA petition dismissed before appointment of counsel, subsequent PCRA petition filed with assistance of counsel "should effectively be treated" as first amended PCRA petition).  Consequently, if a petitioner has previously filed a PCRA petition that was dismissed prior to the appointment of counsel, the Pennsylvania Supreme Court will nonetheless treat the petitioner's first counseled PCRA petition as a first petition.

30

However, even assuming the first prong of Baker's argument, that section 3(1) should be read to provide that a first <u>counseled</u> petition filed before January 16, 1997 must be deemed timely, Baker's argument that his PCRA petition of 1/15/97 was timely under section 3(1) still fails.  Pennsylvania law does not provide that counseled petitions filed prior to the conclusion of direct review do not count as a "first" petition for purposes of section 3(1)'s grace period.  Baker points to no Pennsylvania case to the contrary, but suggests that his PCHA petition of 4/10/87 was "premature."

Baker filed his first counseled petition for state postconviction review after the Pennsylvania Supreme Court granted Baker's petition to remand his case for consideration of claims of ineffective assistance of counsel.  Baker's petition to remand specifically stated that "petitioner and his present attorney desire to raise the issues of ineffective assistance of counsel at this stage of the proceeding by filing a Post-Conviction Hearing Act petition in the court below. . . ." Pet. Remand, <u>Commonwealth v. Baker II</u> (No. 514-520).  The Pennsylvania Supreme Court granted that petition to remand.  <u>See</u> <u>Commonwealth v. Baker II</u>, 614 A.2d at 666 ("We remanded for an evidentiary hearing in the form of a proceeding under the Post Conviction Hearing Act. . . .").

Subsequently, with the assistance of counsel, Baker filed a petition entitled, "Petition Pursuant to Post-Conviction Hearing Act. . . ."  The opening phrase of that petition reads:

> Petitioner, LEE BAKER, a/k/a HERBERT BAKER, JR., defendant in the above case, by his attorney, RICHARD H. KNOX, ESQUIRE, files this Post-Conviction Hearing Act Petition, and states as follows:

PCHA petition of 4/10/87 at 1.

Judge Sabo denied the PCHA petition of 4/10/87 on November 18, 1987, and the

Pennsylvania Supreme Court affirmed that denial on June 17, 1992. <u>Commonwealth v. Baker II</u>,

614 A.2d at 673-74.

Baker cannot argue that the Pennsylvania courts inappropriately reviewed Baker's

ineffective assistance of counsel claims in the form of a PCHA petition, when that was precisely

the form Baker had requested and precisely the form in which he presented his claims.

Moreover, no Pennsylvania court, including the Pennsylvania Supreme Court, has ever suggested

that Baker's filing of a PCHA petition prior to the conclusion of his direct appeal was

procedurally improper or "premature."  Baker relies on a Pennsylvania case wherein remanded

ineffective assistance of counsel claims were not raised in the form of a PCHA or PCRA petition.

<u>See</u> <u>Yarris</u>, 731 A.2d at 583-86.  But Baker marshals no authority, nor has my research revealed

any, for the proposition that a counseled PCHA petition filed before the conclusion of direct

review does not count as a first petition for purposes of section 3(1).  In the absence of such

authority, and in light of the Pennsylvania Supreme Court's treatment of Baker's PCHA petition

of 4/10/87 at face value, I must reach the common sense conclusion that Baker's first counseled

petition, his PCHA petition of 4/10/87, was his first counseled petition for purposes of section

3(1), regardless of whether Baker had concluded his direct review.

Baker's PCRA petition of 1/15/97 was filed more than one year after his final judgment

of conviction and it was not his first, nor his first counseled, postconviction petition.  Therefore,

section 3(1) does not apply to save the timeliness of the petition.  Consequently, Baker's PCRA

petition of 1/15/97 was not timely filed as a matter of Pennsylvania law, nor was it "properly

filed" as a matter of federal law.  Baker does not qualify for statutory tolling of his limitations

period under the AEDPA.

### 3. Equitable Tolling

Although Baker does not qualify for statutory tolling under the AEDPA, Baker's AEDPA limitations period may be equitably tolled for the period in which Baker litigated his PCRA petition of 1/15/97 in the Pennsylvania courts.  Generally, "a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  Pace, 125 S. Ct. at 1814. However, in capital cases, less than "extraordinary circumstances" is required.  Fahy v. Horn, 240 F.3d 239, 244-45 (3d Cir. 2001); Merritt v. Blaine, 326 F.3d 157, 169 (3d Cir. 2003).

Controlling Third Circuit precedent in Fahy v. Horn, 240 F.3d at 242-46, and Banks v. Horn, 271 F.3d 527 (3d Cir. 2001), requires that Baker's AEDPA limitations period be equitably tolled while Baker litigated his PCRA petition of 1/15/97 in state court. In Fahy v. Horn, the petitioner, Fahy, had been convicted of first degree murder and sentenced to death by a Pennsylvania court in 1983.  240 F.3d at 242.  Fahy filed his first PCHA petition in 1986 and it was dismissed in 1987.  Id.; Commonwealth v. Fahy, 737 A.2d 214, 216 (Pa. 1999).  After the Governor of Pennsylvania signed Fahy's death warrant, Fahy filed a second petition under the PCRA in 1992.  Fahy v. Horn, 240 F.3d at 242.  The PCRA court denied relief after a hearing and the Pennsylvania Supreme Court affirmed that denial in 1994.  Id.; Commonwealth v. Fahy, 737 A.2d at 216.  After the Governor signed a second death warrant, Fahy obtained a stay of execution from the Pennsylvania Supreme Court and filed a third petition under the PCRA in 1995.  Fahy v. Horn, 240 F.3d at 242; Commonwealth v. Fahy, 737 A.2d at 216.

While Fahy's third PCRA petition was pending before the PCRA court, Fahy filed his

33

first habeas petition in federal court.  Fahy v. Horn, 240 F.3d at 242.  Fahy's first federal habeas petition was dismissed without prejudice for failure to exhaust state remedies because the Pennsylvania Supreme Court had entered a stay of execution.  Id.

The PCRA court denied Fahy's third PCRA petition on October 25, 1995. Commonwealth v. Fahy, 737 A.2d at 216.  Fahy appealed to the Pennsylvania Supreme Court, but then requested that his appeal be withdrawn.  Fahy v. Horn, 240 F.3d at 242.  Following a hearing before the PCRA court regarding the validity of Fahy's waiver, the Pennsylvania Supreme Court upheld the waiver and dismissed Fahy's appeal on September 17, 1997.  Id.; Commonwealth v. Fahy, 700 A.2d 1256 (Pa. 1997).

Believing that if he filed a federal habeas petition at this point it would be dismissed for failure to exhaust state remedies, Fahy filed a fourth PCRA petition in state court on November 12, 1997.  Fahy v. Horn, 240 F.3d at 242-44.  At the time he filed the fourth PCRA petition, the Pennsylvania Supreme Court, under the "relaxed waiver" doctrine, "declined to apply ordinary waiver principles in capital cases in an effort to prevent the court 'from being instrumental in an unconstitutional execution.'"  Jacobs v. Horn, 395 F.3d 92, 116-118 (3d Cir. 2005).  Fahy reasonably believed that his fourth PCRA petition would be accepted by the Pennsylvania courts either through operation of the relaxed waiver doctrine or because his petition fit within the "governmental interference" exception to the PCRA's statute of limitations.  Fahy v. Horn, 240 F.3d at 245.  The PCRA court denied Fahy's petition on December 29, 1997 as untimely and for failure to set forth a prima facie case that a miscarriage of justice had occurred.  Id.; Commonwealth v. Fahy, 240 F.3d at 217.  While Fahy's fourth PCRA petition was pending before the Pennsylvania Supreme Court, the Pennsylvania Supreme Court announced in

34

Commonwealth v. Albrecht, 720 A.2d 693, 700 (1998), that it would no longer apply relaxed waiver rules in capital cases on PCRA appeal. The Pennsylvania Supreme Court refused to apply relaxed waiver in Fahy's case and ruled that Fahy's fourth PCRA petition was untimely. Commonwealth v. Fahy, 737 A.2d at 218-26.

Fahy filed an amended federal habeas petition in federal court on October 13, 1999. Fahy v. Horn, 240 F.3d at 242. In Fahy v. Horn, the Third Circuit ruled that it was bound by the Pennsylvania Supreme Court's determination that Fahy's fourth PCRA petition was untimely as a matter of Pennsylvania law. Id. at 243-44. Consequently, Fahy's fourth PCRA petition was not "properly filed" as a matter of federal law and Fahy's AEDPA limitations period was not statutorily tolled while Fahy litigated his fourth PCRA petition in state court. Id.

The Third Circuit announced a two-prong test for the application of equitable tolling in capital cases. Under Fahy v. Horn, equitable tolling is appropriate if: 1) the "petitioner has been diligent in asserting his or her claims;" and 2) "rigid application of the statute would be unfair." 240 F.3d at 245. The Third Circuit ruled that Fahy had exercised reasonable diligence when he sought to exhaust state law claims in a fourth PCRA petition even though the petition was ultimately ruled untimely by the Pennsylvania Supreme Court. Id. At the time Fahy filed his fourth PCRA petition, the Pennsylvania Supreme Court could have accepted Fahy's fourth petition as timely "because of its role within the capital case." Id. 245. Because Pennsylvania law regarding acceptance of otherwise untimely petitions in capital cases was "inhibitively opaque" in 1997, and because even the Third Circuit itself had struggled to predict how the Pennsylvania Supreme Court would treat capital petitions, it was reasonable for Fahy to seek to exhaust his claims in the Pennsylvania courts by filing a fourth PCRA petition before filing a

35

petition in federal court.  Id.  Furthermore, the Third Circuit ruled that it was reasonable for Fahy to believe that if he filed a federal habeas petition in federal court before filing his fourth PCRA petition in state court, the federal petition would be dismissed as unexhausted.  Id.

Like the petitioner in Fahy, Baker sought to present his claims to the Pennsylvania courts at a time when Pennsylvania law regarding acceptance of otherwise untimely petitions was "inhibitively opaque."  Id.  It was therefore reasonable for Baker to believe that his PCRA petition of 1/15/97 would be accepted by the Pennsylvania courts.  Furthermore, Baker, unlike the petitioner in Fahy, took the extra step of filing a timely protective federal habeas petition that he asked me to hold in suspense while he exhausted his remaining state claims.  Baker v. Horn I at 2.  Therefore, Baker exercised even greater diligence than the petitioner in Fahy and meets the "reasonable diligence" requirement of equitable tolling.  See also Banks v. Horn, 271 F.3d 527, 535 (3d Cir. 2001), rev'd on other grounds, 536 U.S. 266 (2002) (applying Fahy's equitable tolling rationale to circumstances also materially identical to Baker's case).

The United States Supreme Court's recent ruling in Pace does not alter the conclusion that Baker exercised reasonable diligence.[15]  In Pace, the Supreme Court refused to apply equitable tolling to save the untimeliness of a non-capital federal habeas petition because it found that the petitioner had not pursued his rights diligently.  125 S. Ct. at 1814-15.  Baker's diligence in pursuing his claims in federal court is in sharp contrast to that of the petitioner in Pace.  The petitioner in Pace did not file a protective petition in federal court within the AEDPA's time frame.  Id.  Further, in Pace, the petitioner waited five months after the Pennsylvania courts

---

[15]Pace does not address the "extraordinary circumstances" or "unfairness" prong of the equitable tolling inquiry.  125 S. Ct. at 1814-15 (specifically declining to address petitioner's "extraordinary circumstances" argument).

finally dismissed his PCRA petition before filing his first federal petition.  Id. at 1815.  Baker, by

contrast, filed his first federal petition within the AEDPA's explicit statutory time frame.  It was

only what amounts in hindsight to a mistake of law on the part of the court that led to the

necessity of Baker filing a subsequent amended petition and eventual consideration of principles

of equitable tolling.  In addition, Baker filed his amended federal petition even before the

Pennsylvania Supreme Court brought his state court proceedings to a close by denying Baker's

application for reargument.

It is true that Baker, like the petitioner in Pace, waited a period of years before raising

certain of his claims before the Pennsylvania courts.  The obligation to exercise reasonable

diligence in bringing claims that is a prerequisite for the application of equitable tolling "exists

during the period [the petitioner] is exhausting state court remedies as well."  LaCava v. Kyler,

398 F.3d 271, 277 (3d Cir. 2005).  However, because of the Pennsylvania Supreme Court's

application of the "relaxed waiver" doctrine in capital cases, Baker may have been led to believe

that any number of successive PCRA petitions would be accepted by the state courts.  The

petitioner in Pace, who did not face a capital sentence, could not claim reliance on that doctrine.

125 S. Ct. at 1814-15.  Further, the Pennsylvania courts never ruled that Baker's PCRA petition

of 1/15/97 was not timely.  Therefore, unlike the petitioner in Pace, Baker pursued his rights

diligently.

To invoke equitable tolling, petitioners also typically need to show that extraordinary

circumstances prevented them from asserting their claims in a timely fashion.  Pace, 125 S. Ct. at

1814. However, if a petitioner challenges a capital conviction, "less than 'extraordinary'

circumstances" may trigger equitable tolling of the AEDPA statute of limitations when "rigid

application of the statute would be unfair." Fahy, 240 F.3d at 245.  In the context of a capital

case, the Third Circuit ruled in Fahy:

> When state law is unclear regarding the operation of a procedural
> filing requirement, the petitioner files in state court because of his
> or her reasonable belief that a §2254 petition would be dismissed
> as unexhausted, and the state petition is ultimately denied on these
> grounds, then it would be unfair not to toll the statute of limitations
> during the pendency of that state petition up to the highest
> reviewing state court.

Id.  Fahy filed his fourth PCRA petition in state court, rather than filing a federal habeas petition

in federal court, because he reasonably believed that the Pennsylvania courts would accept his

fourth petition under its "relaxed waiver" doctrine or under an exception to the PCRA statute of

limitations.  Id.  Further, Fahy reasonably believed that filing a federal habeas petition in federal

court would be futile because a federal court would likely dismiss Fahy's petition as

unexhausted.  Id.  Because the Pennsylvania courts ultimately dismissed Fahy's fourth PCRA

petition as untimely, it would have been unfair under those circumstances not to toll Fahy's

AEDPA statute of limitations while Fahy litigated his fourth PCRA petition in state court.  Id.

Accordingly, the Third Circuit in Fahy applied equitable tolling to save the timeliness of Fahy's

federal petition.  Id.  As noted, the only relevant distinction between Baker's case and Fahy is

that the petitioner in Fahy did not file a timely protective federal habeas petition because he

expected that it would be dismissed as a mixed petition, id., whereas Baker actually filed a timely

federal petition that was dismissed as mixed.  Certainly, the fact that Baker took the extra step of

actually filing a timely protective federal petition cannot work against Baker.  If anything, it

would be more unfair to apply the statute rigidly to a petitioner who exercised greater diligence

than did the petitioner in Fahy.

Furthermore, it would be unfair to Baker not to toll his statute of limitations because it is now clear that Baker was correct to argue that his first federal petition should not have been dismissed but should have been held in suspense while he exhausted his remaining state claims. In 1997, when Baker filed his first federal petition, the Third Circuit's interpretation of governing Supreme Court precedent required that I dismiss his petition as a mixed petition. See Christy v. Horn, 115 F.3d 201, 207 (3d Cir.1997). The Supreme Court has since clarified that, in circumstances like Baker's, it is appropriate to stay and abey the federal habeas proceedings while the petitioner exhausts his unexhausted claims in state court. Rhines, 125 S. Ct. at 1531. The Supreme Court has directed that federal district courts ordinarily "should stay, rather than dismiss" mixed petitions when a petitioner exhibits "reasonable confusion about whether a state filing would be timely" and thereby shows "good cause" for filing in federal court. Id. at 1535; Pace, 125 S. Ct. at 1813-14. At the time Baker filed his first federal petition, Pennsylvania law was unclear in two respects that impacted whether Baker's PCRA petition of 1/15/97 would be accepted as timely by the Pennsylvania courts. First, as discussed previously in the context of statutory tolling, Pennsylvania law was unclear regarding whether Baker's petition would be treated as a "first" petition for purposes of section 3(1), the one-year grace period for filing first PCRA petitions. See Commonwealth v. Peterson, 756 A.2d 687 (Pa. Super. Ct. 2000), disapproved of in Commonwealth v. Robinson, 837 A.2d 1157 (Pa. 2003); but see Tedford, 781 A.2d at 1171; Williams, 828 A.2d at 990. Second, even if Baker's PCRA petition of 1/15/97 were not treated as a "first" petition for purposes of section 3(1), Pennsylvania law was unsettled as to whether Pennsylvania courts would accept otherwise untimely PCRA petitions in capital cases under Pennsylvania's "relaxed waiver" doctrine. See Fahy, 240 F.3d at 245 (describing

Pennsylvania's "relaxed waiver" doctrine as "inhibitively opaque" in 1997); <u>Baker v. Horn III</u>, 210 F. Supp. 2d at 621-22.  Consequently, Baker's "reasonable confusion" over whether his PCRA petition would be timely as a matter of Pennsylvania law, and whether the Pennsylvania courts would address the petition on its merits even if it were not timely, constituted "good cause" for his filing of a protective federal habeas petition.  <u>Rhines</u>, 125 S. Ct. at 1531.  Under the Supreme Court's current interpretation of federal law, I should have stayed and abeyed his petition, but following then-governing Third Circuit precedent, I instead dismissed it.  The fact that Baker's argument against dismissal of his first federal petition was ultimately vindicated by the Supreme Court lends further support to Baker's case for unfairness.

It is clear that Baker meets the lower threshold of unfairness, if not the higher standard of extraordinary circumstances, necessary for equitable tolling in capital cases.   To the extent Baker challenges his capital conviction, Baker's one-year AEDPA limitations period therefore was equitably tolled from Baker's filing of his PCRA petition on January 15, 1997 until February 1, 2000, when the Pennsylvania Supreme Court denied his application for reargument, leaving him approximately 100 days to timely file a federal petition under the AEDPA.  Baker filed his amended federal petition on June 25, 1999, while his application for reargument was still pending before the Pennsylvania Supreme Court, and before his AEDPA limitations period began to run again.  Therefore, to the extent Baker challenges his capital conviction, Baker's amended federal petition was timely filed under the AEDPA.

However, Baker does not receive the benefit of <u>Fahy</u>'s lower threshold for equitable tolling to the extent he challenges his non-capital convictions.  <u>Fahy</u> was clearly grounded on the proposition that "death is different."  240 F.3d at 244.  As the court explained:

> Here the penalty is death, and courts must consider the ever-
> changing complexities of the relevant provisions Fahy attempted to
> navigate.  Because the consequences are so grave and the
> applicable law is so confounding and unsettled, we must allow less
> than "extraordinary" circumstances to trigger equitable tolling of
> the AEDPA's statute of limitations when a petitioner has been
> diligent in asserting his or her claims and rigid application of the
> statute would be unfair.

Id. at 245.

The consequences of Baker's non-capital convictions, though serious, do not allow for

Fahy's rationale to extend to Baker's claims to the extent they challenge his non-capital

convictions.  See Merritt, 326 F.3d at 169-70 (refusing to extend Fahy's rationale even though

petitioner faced "grave penalty of mandatory life sentence without possibility of parole").  To

challenge those non-capital convictions in an otherwise untimely federal petition, Baker must

show that extraordinary circumstances prevented him from asserting his claims in a timely

fashion.  Pace, 125 S. Ct. at 1814.

In Merritt v. Blaine, 326 F.3d 157 (3d Cir. 2003), the Third Circuit considered whether

equitable tolling should apply to a petitioner challenging non-capital convictions.  The court

noted that the petitioner, Merritt, was similarly situated to the petitioner in Fahy in that, facing

unclear Pennsylvania law regarding whether a second PCRA petition would be accepted in state

court and the likelihood that a federal habeas petition would be dismissed as unexhausted in

federal court, it was "appropriate. . . for Merritt to have believed he was required to exhaust his

state remedies by filing a second PCRA petition prior to filing a habeas petition in federal court."

Id. at 169.  The court ruled that, even though Merritt's second PCRA petition was ultimately

dismissed as untimely, thereby leaving him ineligible for statutory tolling, Merritt's predicament

did not amount to "extraordinary circumstances" sufficient for equitable tolling in non-capital cases.  Id. at 169-70. While Merritt might have met "the lower bar. . . established [in Fahy] for equitable tolling [in] capital cases," Fahy's rationale could not be applied to Merritt because Merritt did not face the death penalty.  Therefore, Baker too cannot claim that the uncertainty of Pennsylvania law amounted to an extraordinary circumstance preventing him from bringing his claims.

        The fact that I dismissed Baker's timely first federal petition also does not constitute an "extraordinary circumstance" that prevented Baker from asserting his claims.  In Brinson v. Vaughn, 398 F.3d 225 (3d Cir. 2005), the Third Circuit concluded that a district court's erroneous dismissal of a petitioner's timely first federal habeas petition as unexhausted, when the record showed that the petition was, in fact, exhausted, constituted "extraordinary circumstances" for purposes of the AEDPA limitations period.  But the district court's dismissal in Brinson was "mistaken" and erroneous under the then-governing law.  Id. at 231.  My dismissal of Baker's first petition was in a sense erroneous, in that under current governing interpretations of federal law a court ordinarily should not dismiss a similar petition, but it did not contradict the governing law of the time. See Christy, 115 F.3d at 207.

        My dismissal of Baker's first federal petition, while in hindsight unfair, is more analogous to the situation recently discussed by the Supreme Court in Gonzalez v. Crosby, 125 S. Ct. 2641, 2650-51 (2005).  In Gonzalez, the Supreme Court concluded that a district court's dismissal of a non-capital habeas petition under a presumptively incorrect governing Eleventh Circuit precedent did not constitute "extraordinary circumstances" for purposes of Fed. R. Civ. P. 60(b).  Id.  The Court ruled it was not "extraordinary that subsequently, after petitioner's case was

no longer pending, [the Supreme] Court arrived at a different interpretation [than the Eleventh

Circuit]." Id. at 2650.  Similarly, it is not "extraordinary" that the treatment of Baker's timely

first federal petition would be different today.


### D.  Exhaustion

I noted in Baker v. Horn III that Baker exhausted the twenty-two claims contained within

his PCRA petition of 1/15/97.[16]   210 F. Supp. 2d at 625-28.  "A state prisoner must exhaust his

state court remedies before a federal court may grant him habeas relief."  Lambert v. Blackwell,

387 F.3d 210, 231 (3d Cir. 2004).  "Section 2254(c) requires only that state prisoners give state

courts a fair opportunity to act on their claims."  Id. at 232 (quoting Wilwording v. Swenson, 404

U.S. 249, 249-50 (1971)).  "Even if a state court fails to rule on the merits of a claim, a properly

presented claim will be considered exhausted."  Johnson v. Pinchak, 392 F.3d 551, 556 (3d Cir.

2004).

Baker fairly presented each of the twenty-two claims contained within his PCRA petition

of 1/15/97 to the Pennsylvania state courts.  Baker v. Horn III, 210 F. Supp. 2d at 626.  The

petition set forth the factual basis of each claim, specifically identified the federal constitutional

provision or guarantee which Baker claimed had been violated, or cited federal cases addressing

---

[16]Baker presents a total of twenty-five claims in his amended federal petition.  Three of those claims were not included in the PCRA petition of 1/15/97.  Of those three, two (Claim VI and Claim XIII) pertain solely to Baker's death sentence.  I ultimately will not reach the merits of those claims in this opinion, but I noted in Baker v. Horn III that Baker had fairly presented those two claims to the Pennsylvania courts.  210 F. Supp. 2d at 629-30. I deferred consideration of the third claim, Claim XII, Baker's challenge to his convictions under Batson v. Kentucky, 476 U.S. 79 (1986) and Swain v. Alabama, 380 U.S. 202 (1965). I do not reach that claim today and decline to address its procedural posture.

the alleged constitutional violation.  Id. at 626-27.  His appellate brief to the Pennsylvania

Supreme Court likewise "fairly presented" each claim in the petition.  Id. at 627.

The Commonwealth has not disputed that Baker's PCRA petition of 1/15/97 and

accompanying appellate briefs contained the factual and legal bases for Baker's twenty-two

claims.  However, the Commonwealth argued in its motion to dismiss that Baker's purported

withdrawal of his PCRA petition of 1/15/97 before the PCRA court required the conclusion that

Baker did not "fairly present" the claims.  As I explained in detail in Baker v. Horn III and re-

examine infra, the Commonwealth's assertion that Baker withdrew his petition is wholly

unsupported by the record. 210 F. Supp. 2d at 626-28.  I therefore concluded in Baker v. Horn III

as follows:

> The exhaustion requirement mandates only that the state courts be
> afforded a full and fair opportunity to address federal claims.
> Baker afforded the state courts this opportunity.  He fully briefed
> the factual and legal bases of the claims contained in his petition of
> 1/15/97 to the PCRA court and to the Pennsylvania Supreme Court
> on appeal.  Thus, he "fairly presented" his claims to the state courts
> for their consideration.  Given that Baker's "request to dismiss" is
> not fairly supported by the record, I reject the Commonwealth's
> argument that Baker somehow failed to properly exhaust his claims
> because of the purported "request to dismiss."  As long as the
> claims were "fairly presented" to the state courts, the courts'
> decision not to reach the merits of the claims does not defeat a
> finding that the claims were properly exhausted.

Id. at 628 (quoting Castille v. Peoples, 489 U.S. 346, 350 (1989)); see also Johnson, 392 F.3d at

556 ("Even if a state court fails to rule on the merits of a claim, a properly presented claim will

be considered exhausted.").

**E.  Procedural Default**

**1.  Procedural History of PCRA Petition of 1/15/97**

I finally noted in <u>Baker v. Horn III</u> that Baker's claims presented in his PCRA petition of 1/15/97 were not barred by the doctrine of procedural default because the Pennsylvania courts' ground for refusing to reach the merits of Baker's case was not an independent and adequate state ground.  Further discussion of the issue is appropriate at this time as several intervening cases discuss the doctrine of procedural default and whether procedural default bars consideration of Baker's federal claims.  It is helpful first, however, to recap the procedural history of Baker's PCRA petition of 1/15/97, as explained in greater detail in <u>Baker v. Horn III</u>.

The state court record shows that Baker filed his PCRA petition on January 15, 1997 and the petition was assigned to Judge Sabo.  On March 31, 1997, Judge Sabo issued an order dismissing Baker's petition of 1/15/97 "as premature due to on-going litigation in federal court." <u>Commonwealth v. Baker V</u>.  On April 9, 1997, Baker filed a motion for rehearing of the petition of 1/15/97 based on newly discovered evidence which Baker contended supported a <u>Batson</u> claim.  On April 25, 1997, while the motion for rehearing of the PCRA petition was still pending before Judge Sabo, Baker appealed Judge Sabo's March 31, 1997 dismissal of the PCRA petition of 1/15/97 to the Pennsylvania Supreme Court.

On May 7, 1997, after Baker had filed his appeal with the Pennsylvania Supreme Court, Judge Sabo issued a memorandum opinion in support of his March 31, 1997 dismissal of Baker's PCRA petition of 1/15/97 and also denying Baker's motion for a hearing on the <u>Batson</u> claim. <u>Commonwealth v. Baker VI</u> at 1-2.  In the opinion, Judge Sabo stated that Baker's PCRA petition of 1/15/97 "was initially dismissed at the request of defense counsel." <u>Id.</u> at 1.  He attached to the opinion a copy of a proposed order to dismiss Baker's petition "without prejudice due to on-going litigation in federal court." <u>Id.</u> at 3.  Judge Sabo asserted that Baker's counsel

45

had previously submitted the proposed order to the court and noted that the proposed order contained the same typeface and layout as other filings by Baker's counsel.  Id. at 1.  Its attachment to Judge Sabo's May 7, 1997 memorandum opinion marks the first instance when the proposed order appears in the state record.  The opinion's reference to Baker's request to dismiss his PCRA petition also marks the first instance in the record where there is any suggestion that Baker requested dismissal of his petition.

One week later, on May 14, 1997, Baker filed a petition for reconsideration of Judge Sabo's May 7, 1997 opinion.  In the petition, Baker's counsel acknowledged that he did, in fact, submit the proposed order which was attached to the May 7, 1997 opinion to the court.  Pet. Recons. at 3, Commonwealth v. Baker, Nos. 514-520 (Pa. Ct. Comm. Pl. Aug. 28, 1997). However, Baker's counsel strenuously denied ever seeking dismissal.  Id. at 1, 3-4.  Rather, Baker's counsel, Billy Nolas, explained that Judge Sabo had recently dismissed the PCRA petition of another of Nolas's clients, Otis Peterkin, due to the pendency of Peterkin's federal habeas corpus petition.  Id. at 3.  As an officer of the court, Nolas notified the court that Baker was similarly situated to Peterkin, and provided a proposed order which matched the language of Judge Sabo's order in Peterkin's case and specified procedures for appealing the order.  Id. Nolas argued that he had submitted the order "solely in an effort to expeditiously move the case forward if the court was unwilling to grant relief in Baker for the same reason it denied relief in Peterkin (i.e., as premature due to pending federal litigation.)" Id. at 3-4.  The petition for reconsideration stated in no uncertain terms that Baker "did not, does not and has not ever requested that this Court dismiss his Petition" and that Baker "continues to seek nothing more than the opportunity to litigate the merits of his claims." Id. at 4.

In an August 28, 1997 memorandum opinion, Judge Sabo denied Baker's petition for reconsideration.  Commonwealth v. Baker, No. 514-520 (Pa. Ct. Comm. Pl. Aug. 28, 1997) ("Commonwealth v. Baker VII").  The opinion did not address whether Baker had ever requested dismissal of his PCRA petition.  Rather, Judge Sabo expressed frustration with what he viewed as a "procedural morass" stemming from Baker's various appeals and petitions for reconsideration.  Id. at 2.  He further noted that Baker's petition for reconsideration challenging Judge Sabo's assertion that Baker had requested dismissal was untimely because it was filed more than one month after the order of dismissal was issued on March 31, 1997.[17]  Id.

Meanwhile, Baker's appeal to the Pennsylvania Supreme Court proceeded from Baker's filing of a notice of appeal on April 25, 1997.  Baker argued to the Pennsylvania Supreme Court that his PCRA petition of 1/15/97 should not have been dismissed as "premature due to ongoing federal litigation," that his PCRA petition was timely, and that he was deserving of relief on twenty-two claims.  The Commonwealth made no mention in its briefing of Judge Sabo's assertion that Baker had requested that his PCRA petition be dismissed.  Indeed, the Commonwealth characterized the only issue raised by Baker's appeal as one of timeliness under 42 Pa. Cons. Stat. Ann. § 9545, the provision providing for a one-year statute of limitations on PCRA petitions.  The Commonwealth characterized what it viewed as the only question raised by Baker's case as follows:

> Counter-Statement of the Questions Involved
>
> Was defendant's third petition for post-conviction relief properly dismissed because the trial court lacked jurisdiction to

---

[17]Baker's petition for reconsideration was filed seven days after Judge Sabo's first suggestion on the record that the petition was dismissed at Baker's request.

entertain it under 42 Pa.C.A. § 9545?
        (Not discussed by the court below).

Brief for Appellee at 1, Commonwealth v. Baker VIII (Nos. 189-190).

On May 4, 1999, the Pennsylvania Supreme Court affirmed Judge Sabo's March 31, 1997 dismissal, but not on the ground stated in the order of dismissal–that the litigation was "premature due to ongoing federal litigation"–nor on any ground put forth by the Commonwealth on appeal.  The court affirmed on the ground that it was not error for the PCRA court to grant Baker's request for a dismissal, as stated in Judge Sabo's May 7, 1997 memorandum.

Commonwealth v. Baker VIII, 728 A.2d at 953-53.  The Pennsylvania Supreme Court articulated its reasoning as follows:

> . . . In January of 1997, Appellant [Baker] filed a PCRA petition in the court of common pleas.  Appellant then apparently moved to have the PCRA petition dismissed because the federal habeas corpus proceedings were pending.  On March 31, 1997, Judge Sabo granted this motion to dismiss. . . .
>
> The rules of criminal procedure allow a party to "withdraw a petition for post-conviction collateral relief at any time." Pa.R.Crim.P. 1505.  We cannot, therefore, rule that it was error to grant Appellant's request for a dismissal. . . .
>
> . . . Due to Appellant's requested dismissal, none of these issues were litigated before the common pleas court and thus, no record has been developed for this Court to review.  It is a general rule that, "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal."  Therefore, we do not reach the merits of these issues.

Id.

As I noted in Baker v. Horn III, under the doctrine of procedural default, when a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate

48

state procedural rule, federal habeas review of the claims is barred unless the prisoner can

demonstrate cause for the default and actual prejudice as a result of the alleged violation of

federal law, or demonstrate that failure to consider the claims will result in a fundamental

miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). State procedural rules

are "inadequate" and insufficient to bar habeas relief if "they are not 'firmly established and

regularly followed,' or if they are 'novel [ ]' and unforseeable." Bronshtein, 404 F.3d 700, 706

(3d Cir. 2005) (citations omitted). Judge Alito, writing for the Third Circuit, recently explained

the importance of requiring "adequacy" of state procedural bars:

> First, the test ensures that federal review is not barred
> unless a habeas petitioner had fair notice of the need to follow the
> state procedural rule. . . .
> Second, the firmly established and regularly followed test
> prevents discrimination. Novelty in procedural requirements can
> be used as a means of defeating claims that are disfavored on the
> merits. If inconsistently applied procedural rules sufficed as
> "adequate" grounds of decision, they could provide a convenient
> pretext for state courts to scuttle federal claims without federal
> review. The requirement of regular application ensures that review
> is foreclosed by what may honestly be called "rules"–directions of
> general applicability–rather than by whim or prejudice against a
> claim or claimant.

Bronshtein, 404 F.3d at 707-08 (citations omitted).

In addition, "[t]he procedural default doctrine self-evidently is limited to cases in which

[under state law] a 'default' actually occurred–i.e., cases in which the prisoner actually violated

the applicable state procedural rule." Randy Hertz & James Liebman, Federal Habeas Corpus

Practice and Procedure § 26.2c, at 1154, 1154 n.15, 1156 n.16 (4th ed. 2001) ("Hertz &

Liebman"); see also Hill v. Mitchell, 400 F.3d 308, 314 (6th Cir. 2005) (reviewing de novo

petitioner's constitutional claim despite state court's prior "misplaced" reliance on its own rule of

49

procedural default); <u>Greer v. Mitchell</u>, 264 F.3d 663, 675 (6th Cir. 2001) ("[W]hen the record reveals that the state court's reliance upon its own rule of procedural default is misplaced, we are reluctant to conclude categorically that federal habeas review of the purportedly defaulted claim is precluded."); <u>Kubat v. Thieret</u>, 867 F.2d 351, 366 n.11 (7th Cir. 1989) (despite prior ruling by Illinois Supreme Court that petitioner had waived claim by failing to raise it on direct appeal, because the record clearly shows that petitioner did, in fact, raise the issue, federal habeas court not barred from reaching merits); <u>see also</u> <u>Douglas v. Alabama</u>, 380 U.S. 415, 421 (1965) (in light of record showing that defendant objected three times, "difficult to understand" state courts' conclusion that defendant had failed to object); <u>Holloway v. Horn</u>, 355 F.3d 707, 713-14, 718 n.5 (disputing Pennsylvania Supreme Court's determination that claim was defaulted by waiver on PCRA review). "[T]he question of the sufficiency of the petitioner's effort to abide by the state rule is one of federal, not state law." <u>Hertz & Liebman</u>, at 1158 n.16; <u>Douglas</u>, 380 U.S. at 420-21.

The Pennsylvania courts did not reach the merits of the claims presented in Baker's PCRA petition of 1/15/97. The Pennsylvania Supreme Court decided that consideration of Baker's federal claims was barred by the interaction of two Pennsylvania rules. <u>Commonwealth v. Baker VIII</u>, 728 A.2d at 952-53. First, former Pennsylvania Rule of Criminal Procedure 1505, which provided that "The judge may grant leave to amend or withdraw a petition for post-conviction collateral relief at any time," barred consideration of Baker's federal claims before the PCRA court because Baker "apparently" moved to withdraw his petition and the PCRA court acted within its discretion by granting Baker's request. <u>Id.</u> Second, the Pennsylvania Supreme Court could not consider Baker's federal claims on appeal, because, as a consequence of the

50

withdrawal below, Baker had not litigated his federal claims before the PCRA court and

Pennsylvania Rule of Appellate Procedure 302 prohibits litigants from raising issues for the first

time on appeal. Id.

Application of Rules 302 and 1505 to prevent consideration of Baker's federal claims

does not constitute an adequate state ground sufficient to bar consideration of Baker's claims on

habeas review.  This is so because: 1) nothing in the record suggests that Baker actually defaulted

pursuant to Rule 1505–i.e., nothing in the record suggests that Baker requested dismissal of his

PCRA petition; 2) Pennsylvania courts have not consistently applied Rules 302 and 1505 in

similar circumstances to bar consideration of federal claims;[18] and 3) both before and after

Baker's purported default, the Pennsylvania Supreme Court frequently overlooked procedural

barriers to PCRA relief under its "relaxed waiver" doctrine in capital cases.

### 2. Actual Violation of Procedural Rules Relating to PCRA Withdrawal

It is unclear according to which standard a federal habeas court must review a state

court's assertion that a petitioner actually violated a state procedural rule.  The Commonwealth

argued in its motion to dismiss that the state court "findings" regarding Baker's purported

requested dismissal of his PCRA petition of 1/15/97 are entitled to a presumption of correctness

under § 2254(e)(1).  That provision of the AEDPA provides:

> In a proceeding instituted by an application for a writ of habeas
> corpus by a person in state custody pursuant to the judgment of a
> State court, a determination of a factual issue made by a State court

---

[18]A conclusion that the record does not support a finding that the petitioner "actually
violated" an otherwise adequate state procedural rule could alternatively be stated as a conclusion
that the rule is not "adequate" because the rule is not consistently applied to similarly situated
individuals–i.e., individuals whom the record does not show to have violated the rule.  See, e.g.,
Forgy v. Norris, 64 F.3d 399, 401-02 (8th Cir. 1995).

shall be presumed to be correct.

28 U.S.C. § 2254(e)(1).  But as I noted in Baker v. Horn III, not only did the Pennsylvania

Supreme Court call into question the validity of that finding by noting only that Baker had

"apparently" requested withdrawal, but the "finding" of withdrawal could not be entitled to

section 2254(e)(1)'s presumption of correctness because that section applies only to factual

issues that are "basic, primary or historical facts: facts 'in the sense of a recital of external events

and the credibility of their narrators. . . .'"  Berryman v. Morton, 100 F.3d 1089, 1094 (3d Cir.

1996) (quoting Townsend v. Sain, 372 U.S. 293, 309 (1963)).  Whether or not Baker requested

dismissal of his petition before the PCRA court is not such a basic, primary or historical fact.

Those cases that question a state court's prior conclusion of actual default under state law

have not articulated a standard of review.  See Douglas, 380 U.S. at 421 (noting only that "it is

difficult to understand" the state courts' conclusion that defendant had failed to object

sufficiently under state law); Hill, 400 F.3d at 314 (accepting without discussion district court's

determination that the state court's finding of procedural default was misplaced); Kubat, 867

F.2d at 366 n.11 (noting that record "clearly showed" that petitioner raised issue, despite prior

state ruling to the contrary).  I need not resolve the question here because, whatever the standard,

a federal court surely need not defer to a state court finding of procedural default that is wholly

unsupported by the record.

As I noted in Baker v. Horn III, nothing in the record supports the assertion that Baker

requested or moved for dismissal of his PCRA petition of 1/15/97.  The PCRA court's March 31,

1997 dismissal order does not mention that the dismissal was at the request of Baker.

Commonwealth v. Baker V.  The record contains no motion to withdraw or dismiss, letter requesting dismissal, nor transcript of a hearing in which Baker made an oral request to dismiss the petition.  See Baker v. Horn III, 210 F. Supp. 2d at 634.

Under Pennsylvania law, a fact does not become of record solely by virtue of a trial court's assertion of the "fact" in its opinion; it must be independently supported by the record. Id. at 627 (citing Hatalowich v. Bednarski, 461 A.2d 1292, 1294 (Pa. Super. Ct. 1983)); see also Treu v. Harleysville Ins. Co., 662 A.2d 1106, 1108 (Pa. Super. Ct. 1995) (refusing to accept in that case Judge Sabo's assertions regarding off-the-record conference absent record support). Nor can a document become of record solely by virtue of its inclusion in the trial court's opinion. Baker v. Horn III, 210 F. Supp. 2d at 628 (citing Hatalowich, 461 A.2d at 1294). Consequently, neither Judge Sabo's after-the-fact assertion in his May 7, 1997 opinion that the petition was dismissed at the request of defense counsel, nor the attachment of the proposed order to the May 7, 1997 opinion provides record support that Baker requested dismissal of his petition.   Id. at 627-28, 634.

Where there has been no actual violation of a procedural rule, the procedural default doctrine cannot apply.  See Hill, 400 F.3d at 314; Greer, 264 F.3d at 675; Kubat, 867 F.2d at 366 n.11; see also Holloway, 355 F.3d at 713, 718 n.5.  Therefore, the claims included within Baker's PCRA petition of 1/15/97 are reviewable in these federal habeas proceedings.

### 3.  Consistent Application of Rules Relating to PCRA Withdrawal

Even assuming that Baker requested dismissal of his PCRA petition of 1/15/97 in an off-the-record fashion and further assuming that such an off-the-record request could theoretically have legal effect under Pennsylvania law, Pennsylvania rules regarding withdrawals of PCRA

petitions were not applied consistently in Baker's case.  First, Pennsylvania courts typically require that requests for withdrawal of PCRA petitions and the granting of such requests be firmly rooted in the record.  As just noted, there is no record evidence of Baker's withdrawal.  In every other identified instance of the Pennsylvania Supreme Court reviewing a voluntary PCRA waiver, there has been record evidence indicating that the petitioner actually requested withdrawal.  See Williams, 828 A.2d at 986 (reciting docket history in "painstaking detail"); Commonwealth v. Saranchak, 810 A.2d 1197, 1198 (Pa. 2002); Commonwealth v. Michael, 755 A.2d 1274, 1276 (Pa. 2000); Commonwealth v. Fahy, 700 A.2d 1256, 1258-59 (Pa. 1997).  Thus, whether characterized as a conclusion that the record does not support a finding that Baker actually violated the procedural rule, or as a conclusion that the Pennsylvania Supreme Court inconsistently applied its rules regarding waiver, which typically require that there be record evidence of a waiver before it is accepted, the state ground which barred consideration of Baker's federal claims in state court is not adequate to bar consideration of those claims in federal court.

Second, at the time of Baker's purported withdrawal of his PCRA petition of 1/15/97, Pennsylvania courts required waiver colloquies in capital cases to ensure that a petitioner's waiver was knowing and intelligent.  See Williams, 828 A.2d at 991 (Pa. 2003).  But Judge Sabo conducted no such colloquy in Baker's case, nor did he take any steps to ensure that Baker's waiver was knowing and intelligent, or reflective of Baker's wishes.  While Pennsylvania's Rules of Criminal Procedure did not explicitly require a waiver colloquy at that time[19], the

---

[19]Current Pennsylvania Rule of Criminal Procedure Rule 904(G)(1) now requires that before permitting the withdrawal of a PCRA petition, a judge must find, after a colloquy on the record, that the defendant is competent, and that the waiver is knowing, intelligent, and voluntary.

Pennsylvania Supreme Court specifically ruled that, by 1997, the time of Baker's purported

withdrawal, "colloquies by the trial court were conducted frequently enough in capital cases to be

considered routine."  Id.; see also Fahy, 700 A.2d at 1258 (upholding PCRA court's finding of

waiver in capital case after lengthy plea colloquy in which the petitioner "clearly and

unambiguously stated that he wished to waive his right to all further appeals and that he wanted

his sentence carried out as soon as possible"); Commonwealth v. Bronshtein, 729 A.2d 1102,

1003-07 (1999) (upholding waiver following lengthy colloquy before PCRA court); Michael, 755

A.2d at 1276 (Flaherty, C.J., plurality opinion) (reviewing merits despite prior on-the-record

colloquy waiving PCRA rights); id. at 1281-84 (Castille, J., concurring) ("When faced with a

dispute concerning a request to withdraw, and the knowing, intelligent, and voluntary nature of

an expression to waive further review, we must of necessity remand the matter for a factual

determination.").  The Pennsylvania Supreme Court ruled contemporaneously to Baker's

purported withdrawal that:

> The withdrawal of a PCRA petition by a petitioner sentenced to
> death is of such a magnitude that it requires a court to take
> extraordinary steps to ensure that the petitioner understands the
> effect that the withdrawal will have on his or her ability to seek any
> further relief in this Court.

Williams, 828 A.2d at 992 (describing the holding of Commonwealth v. Fahy, 700 A.2d 1256,

1258 (Pa. 1997).)  Indeed, the Pennsylvania Supreme Court has noted that it required and

continues to require colloquies "before accepting any other significant waiver in capital cases."

Id. at 992 n.11.  In fact, the Pennsylvania Supreme Court specifically identified Baker's case as

the "only recent capital case in which [the Pennsylvania Supreme Court] permitted the

withdrawal of a PCRA petition without a colloquy." Id. (emphasis added).[20]

Finally, the Pennsylvania Supreme Court has not consistently treated waivers of PCRA rights in capital cases as irrevocable.  In Commonwealth v. Saranchak, 810 A.2d 1197, 1198 (Pa. 2002), the petitioner, Donald Saranchak, submitted a letter to the PCRA court indicating that he wished to discharge his attorneys and forego further challenge to his capital conviction.  The PCRA court conducted a colloquy, in which Saranchak "confirmed that he understood the nature of the capital proceedings, his entitlement to counsel, and his rights under the PCRA, but nevertheless maintained his wish to waive such rights." Id.  Finding that Saranchak's waiver was knowing, voluntary, and intelligent, the PCRA court removed the petitioner's appointed counsel, the Defender Association of Philadelphia, and dismissed the petition. Id.  The Defender Association filed an appeal and a motion to stay Saranchak's execution with the Pennsylvania Supreme Court. Id.  Following supplementation of the record by the PCRA court which confirmed that Saranchak had the ability to effectuate an appropriate waiver, the Pennsylvania Supreme Court concluded that the PCRA court "had made sustainable legal findings supporting its order approving the discharge of the Defender Association as Saranchak's counsel and the withdrawal of his post-conviction petition." Id.   The Pennsylvania Supreme Court denied the motion for stay of execution and dismissed the Defender Association's appeal based on lack of standing. Id.

Roughly three weeks later, during the pendency of the Defender Association's second motion for stay of execution, Saranchak applied for reconsideration of the court's order.  He

---

[20]In dicta, the Pennsylvania Supreme Court distinguished Baker's case from the case before it on the ground that Baker filed a counseled "motion to dismiss." Williams, 810 A.2d at 991.  Of course, as previously stated, the record shows that Baker filed no such motion.

attached "a statement reflecting his desire to retract his waivers, to exercise his right to challenge

his convictions and sentences through any appropriate legal means, and to be represented in this

effort by the Defender Association."  Id. at 1199.  The Pennsylvania Supreme Court considered

whether Saranchak's prior valid waiver was irrevocable or whether, in a capital case,

"Saranchak's reversal prior to termination of the appeal proceedings commenced by the Defender

Association constitutes a ground upon which the post-conviction proceedings may be reinstated."

Id.  The court concluded:

> In light of the subject matter, considering the existing restraints on
> serial petitions, given that the General Assembly has not spoken to
> the present situation, and recognizing the guiding preference for
> merits review in capital cases, we believe that the better course lies
> with the reinstatement alternative.

Id.  at 1200.  The court's reinstatement of Saranchak's petition was not an "occasional act of

grace," Johnson, 392 F.3d at 559, but rather, the court described its ruling as having general

application to post-waiver retractions made by petitioners in capital cases. Saranchak, 810 A.2d

at 1199-1200; see also Michael, 755 A.2d at 1276 (Flaherty, C.J., plurality opinion) (reviewing

merits despite prior on-the-record colloquy waiving PCRA rights).

Thus, even assuming: 1) that Baker's counsel requested withdrawal of the PCRA petition

in an off-the-record manner; 2) that such off-the-record requests to withdraw may theoretically

have legal effect as a matter of Pennsylvania law; 3) that the Pennsylvania courts consistently

treat such requests as having legal effect; and 4) that the Pennsylvania courts consistently

allowed withdrawals without first ascertaining that the waiver was knowing and intelligent and,

in fact, reflective of the petitioner's desires; the Pennsylvania courts nevertheless applied their

procedural rules inconsistently in Baker's case by refusing to allow Baker to retract his prior

waiver.  From the moment that the PCRA court first indicated that it believed Baker to have requested withdrawal of his PCRA petition, Baker made his active desire to litigate the merits of his claims plain.  Baker clearly stated in his petition for reconsideration of the PCRA court's May 7, 1997 memorandum that he was "anxious to litigate the merits of that Petition and his claims in this court."  Pet. Recons. at 1, <u>Commonwealth v. Baker</u>, Nos. 514-520 (Pa. Ct. Comm. Pl. Aug. 28, 1997).  On appeal, the first sentence of Baker's argument within his brief to the Pennsylvania Supreme Court reads, "Appellant wants to litigate his case."  Initial Br. Appellant at 8, <u>Commonwealth v. Baker VIII</u> (Nos. 189-190). Following the Pennsylvania Supreme Court's affirmance of Judge Sabo's dismissal of Baker's PCRA petition, in his application for reargument, Baker stated that "[a]ppellant's actions in this case clearly demonstrate that his intention has always been to litigate the merits of his issues."  Application for Reargument, <u>Commonwealth v. Baker VIII</u> (Nos. 189-190).  At all levels of review, Baker made clear that he desired to litigate his petition and pursue his claims for relief under the PCRA.  Yet, the Pennsylvania Supreme Court, rather than allowing Baker to retract any purported prior waiver as it did in <u>Michael</u> and <u>Saranchak</u>, ruled that Baker had irrevocably waived his right to vindicate fundamental federal rights on post-conviction review of his death sentence.

### 4. Pennsylvania's "Relaxed Waiver" Doctrine

Finally, as I explained in <u>Baker v. Horn III</u>, the Pennsylvania Supreme Court, at the time of Baker's PCRA petition of 1/15/97, did not consistently apply a broad array of procedural rules that would otherwise bar merits review in capital cases under its "relaxed waiver" doctrine.  210 F. Supp. 2d at 636-37; <u>see also</u> <u>Bronshtein</u>, 404 F.3d at 708-10; <u>Jacobs v. Horn</u>, 395 F.3d 92, 116-118 (3d Cir. 2005). The Third Circuit recently noted that:

58

> Under the relaxed waiver doctrine, the Pennsylvania Supreme
> Court declined to apply ordinary waiver principles in capital cases
> in an effort to prevent the court "from being instrumental in an
> unconstitutional execution."

Jacobs, 395 F.3d at 117 (quoting Commonwealth v. Albrecht, 720 A.2d 693, 700 (1998)).

Consequently, procedural rules subject to "relaxed waiver" were not "firmly established and

regularly followed" with respect to petitioners in capital cases.  The Third Circuit recently

reaffirmed that, at least as late as November 23, 1998, when the Pennsylvania Supreme Court

decided it would apply ordinary waiver rules in capital cases on PCRA appeal in Albrecht,

capital PCRA petitioners in Pennsylvania did not have fair notice that they would not receive the

benefit of the "relaxed waiver" rule and that their failure to comply with state procedural rules

would permanently bar merits review of their claims.  Bronshtein, 404 F.3d at 708-10; Jacobs,

395 F.3d at 117-18.  Baker's default, if it occurred at all, occurred no later than March 31, 1997,

when Judge Sabo dismissed Baker's petition "as premature due to on-going litigation in federal

court."  Commonwealth v. Baker V.  That is well before the earliest date PCRA petitioners were

potentially on notice of the demise of the "relaxed waiver" rule.[21]  Rules are "inadequate" if they

are "novel and unforseeable."  Bronshtein, 404 F.3d at 707.  Consequently, strict application of

Pennsylvania Rules of Criminal Procedure 302 and 1505 does not constitute an adequate state

---

[21]A variant of the "relaxed waiver" rule might be said to live on in Pennsylvania
jurisprudence with respect to the particular procedural bar at issue in this case, the binding nature
of prior voluntary waivers of PCRA rights.  See Saranchak, 810 A.2d at 1198 (allowing
retraction of prior knowing and intelligent waiver of PCRA rights in capital case); id. at 1200
(Cappy, J., concurring) (joining majority on sole ground that "death is different" and
acknowledging "sound jurisprudential argument" of dissent, which would refuse to allow
retraction of waiver); Michael, 755 A.2d at 1276 (Flaherty, C.J., plurality opinion) (reviewing
merits of capital PCRA petition despite prior on-the-record colloquy waiving PCRA rights).

ground to bar consideration of Baker's claims on habeas review.[22]

"State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims."  Hathorn v. Lovorn, 457 U.S. 255, 263 (1982). The Pennsylvania courts did not apply their procedural rules regarding withdrawal of PCRA petitions evenhandedly in Baker's case.  Therefore, the Pennsylvania courts' decision not to reach the merits of Baker's federal claims does not bar subsequent review of those claims in the context of a petition for writ of habeas corpus in federal court.

## IV.  Standard of Review

This petition is governed by the revisions to the federal habeas statute enacted in the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-32, 110 Stat. 1214 (1996), effective April 24, 1996 ("AEDPA").  Pursuant to the AEDPA:

> [W]hen a federal court reviews a state court's ruling on federal law, or its application of federal law to a particular set of facts, the state court's decision must stand unless it is "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

---

[22]I have ruled that Baker's PCRA petition of 1/15/97 was untimely as a matter of Pennsylvania law.  However, the untimeliness of that petition does not constitute an independent and adequate state ground sufficient to bar consideration of Baker's claims on habeas review. This is so for two reasons: 1) the Pennsylvania Supreme Court did not rely on untimeliness as a ground for refusing to reach the merits of Baker's claims and "[c]omity does not require, nor would it justify, any endeavor by [a federal court] to substitute an unmentioned procedural ground in place of [the basis for the state court's decision] in order to hold [the petitioner's] claims procedurally defaulted," Villot v. Varner, 373 F.3d 327, 336 (3d. Cir. 2004); and 2) even had the Pennsylvania Supreme Court dismissed Baker's PCRA petition of 1/15/97 as untimely, strict application of PCRA's timeliness requirements in 1997 could not be not an independent and adequate state ground barring federal review due to the Pennsylvania Supreme Court's practice of overlooking such procedural barriers under its "relaxed waiver" doctrine.  See Bronshtein, 404 F.3d at 708-10.

Lam v. Kelchner, 304 F.3d 256, 263 (3d Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)).[23]

A state court decision is "contrary" to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Terry Williams v. Taylor, 529 U.S. 362, 405-06 (2000), quoted in Lam, 304 F.3d at 263. Under the "unreasonable application" clause, habeas relief should be granted "when the state court 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular [] case.'" Id. (quoting Terry Williams, 529 U.S. at 407-08). Furthermore, with respect to this clause, habeas relief will only be warranted if the "state court's application of clearly established federal law was objectively unreasonable," not merely "incorrect." Terry Williams, 529 U.S. at 409-410, quoted in Lam, 304 F.3d at 263.

Under the unique procedural history of Baker's case, many of the claims were properly preserved and presented to the state, but the state court nevertheless declined to reach the merits of the claims. Section 2254(d)(1) only applies to claims that were "adjudicated on the merits in state court." If a claim was not adjudicated on the merits in state court proceedings then the restrictive standard of review in section 2254(d) does not apply and the claim should be reviewed de novo. See Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) ("[W]hen, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA . . . do not

_____

[23]Federal habeas relief is also available if the state court's decision was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

apply. . . . In such an instance, the federal habeas court must conduct a <u>de novo</u> review over pure

legal questions and mixed questions of law and fact"); <u>see also</u> <u>Lambert</u>, 387 F.3d at 238 (same);

<u>Bronshtein</u>, 404 F.3d at 710 n.4 ("We do not apply the deferential standards of review set out in

28 U.S.C. § 2254(d) because this claim was not 'adjudicated on the merits' by the state supreme

court.")[24]

Acknowledging that a <u>de novo</u> standard of review applies to those claims not adjudicated

on the merits by the state court, the Commonwealth nevertheless takes exception with what it

views as a "paradoxical," "illogical and troubling" procedural outcome in this case.  (Resp't's

Reply Am. Habeas Corpus Pet. at 20-21, Resp. R. Mot. Summ. J. at 4-8.)  It argues that

reviewing <u>de novo</u> Baker's claims that the Commonwealth violated his fundamental

constitutional rights in the process of convicting him and sentencing him to death directly

undermines the principles of comity and federalism underlying our nation's habeas

jurisprudence.  Indeed, due respect to principles of comity and federalism are of the utmost

importance in the habeas context.  <u>E.g.</u>, <u>Coleman</u>, 501 U.S. at 726 ("This is a case about

federalism. It concerns the respect that federal courts owe the States and the States' procedural

rules when reviewing the claims of state prisoners in federal habeas corpus."); <u>Lambert</u>, 387 F.3d

at 268.  For precisely that reason, I dismissed Baker's first habeas petition containing

---

[24] In <u>Weeks v. Angelone</u>, 528 U.S. 225 (2000), the Supreme Court held that state court
decisions that summarily dispose of a claim on the merits but fail to offer any explanation must
still be reviewed deferentially under AEDPA.  <u>Chadwick v. Janecka</u>, 312 F.3d 597, 606 (3d Cir.
2002).  AEDPA deference also applies even if the state court does not cite to or indicate any
awareness of federal cases as long as the reasoning of the state court does not contradict relevant
Supreme Court precedent.  <u>Priester v. Vaughn</u>, 382 F.3d 394 (3d Cir. 2004). However, these
holdings do not apply to those claims whose merits a state court specifically declines to reach, as
was the case in <u>Commonwealth v. Baker VIII</u>, 728 A.2d at 952-53 (specifically declining to reach
the merits of the claims raised in Baker's PCRA petition of 1/15/97).

unexhausted claims so that the Commonwealth would have the first opportunity to address the merits of those claims.  (Baker v. Horn I at 2-4 (following Rose v. Lundy, 455 U.S. 509 (1982) (comity requires district courts to dismiss mixed petitions)).)  However, the Pennsylvania courts chose not to adjudicate those claims on the merits, instead ruling on inconsistently applied state-law grounds that Baker had voluntarily withdrawn his claims.  The Commonwealth now seeks to avoid the consequences of that decision.  Federal law provides otherwise.

## V.  Accomplice Liability Instructions

### A.  Introduction

Baker presents two distinct, but interwoven, constitutional claims regarding the trial court's jury instructions on first degree murder and accomplice liability.[25]  First, Baker argues that the jury instructions relieved the Commonwealth of its burden of proving every element of first degree murder beyond a reasonable doubt, thereby violating Baker's Fourteenth Amendment right to due process.[26]  In particular, Baker argues that the instructions permitted the jury to find

_____

[25]Baker presented both claims to the state courts in his PCRA petition of 1/15/97.

[26]Baker acknowledges that his trial counsel did not object to the jury instructions at trial. Issues not raised at trial are normally not preserved for appellate review under Pennsylvania law and would thereby be procedurally defaulted, absent a showing of cause and prejudice or fundamental miscarriage of justice.  Commonwealth v. Kampo, 391 A.2d 1005 (Pa. 1978); Coleman, 501 U.S. at 750.   However, Baker's direct due process claim is not barred by the doctrine of procedural default because at the time of the default, and, indeed, at the time Baker filed his PCRA petition of 1/15/97, the Pennsylvania Supreme Court applied relaxed waiver rules in capital cases.  Under the relaxed waiver doctrine, the Pennsylvania Supreme Court reached the merits of ostensibly waived claims.  See Commonwealth v. LaCava, 666 A.2d 221, 228 n.8 (Pa. 1995) (applying relaxed waiver rule to address merits of jury instruction claim despite failure to object at trial in capital case); Commonwealth v. Albrecht, 720 A.2d 693 (Pa. 1998) (marking demise of relaxed waiver rule in Pennsylvania capital post-conviction appeals); Bronshtein, 404 F.3d at 708-10; Jacobs, 395 F.3d at 116-118.  The Commonwealth does not appear to argue that

Baker guilty of first degree murder without finding that Baker possessed the specific intent to kill, an element of that crime under Pennsylvania law.  Second, Baker argues that he was deprived of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments when his attorney failed to object to the improper jury instructions.  These claims were never adjudicated on the merits in state court proceedings because the state courts refused to reach the merits of the claims when they were presented in Baker's PCRA petition of 1/15/97.  PCRA petition of 1/15/97 at 15-19; Initial Br. Appellant at 26-29, Commonwealth v. Baker VIII (Nos. 189-190); Commonwealth v. Baker VIII, 728 A.2d at 952-53.  Therefore, I will conduct a de novo review.  Lambert, 387 F.3d at 238.

A habeas petitioner is entitled to relief on a direct due process challenge to erroneous jury instructions only if the petitioner shows: 1) there is a reasonable likelihood that the jury applied the challenged instructions in a way that violates the Constitution, Smith v. Horn, 120 F.3d 400, 411 (3d Cir. 1997); and 2) the error was not harmless, i.e., it had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993); Smith, 120 F.3d at 417.  For an ineffective assistance of counsel claim, the petitioner must show: 1) that his counsel's representation was deficient such that it "fell below an objective standard of reasonableness," and 2) that the deficient performance prejudiced his trial to the extent that it undermined confidence in the trial's outcome.  Strickland v. Washington, 466 U.S. 668, 687-90 (1984).

---

the direct due process claim is defaulted due to counsel's failure to object at trial.  Moreover, the Pennsylvania Supreme Court did not apply this procedural bar to deny Baker relief. "Comity does not require, nor would it justify, any endeavor by [a federal court] to substitute an unmentioned procedural ground in place of [the basis for the state court's decision] in order to hold [the petitioner's] claims procedurally defaulted." Villot, 373 F.3d at 336.

I will first consider the merits of Baker's claim that the jury instructions unconstitutionally relieved the Commonwealth of its burden of proving every element of Baker's offense.  Second, if any error in the jury instructions was of constitutional magnitude, I will consider whether that error was harmless.  If there was an error of constitutional magnitude that was not harmless, Baker will be entitled to relief, obviating the need to consider Baker's additional challenges to his first degree murder conviction and penalty.  But because Baker's related claim that the failure of Baker's trial counsel to object to the instructions constituted a deprivation of Baker's right to the effective assistance of counsel is so closely tied to his direct claim, I will continue on to consider that claim. This will entail, first, an inquiry into whether Baker's counsel's performance was unreasonably deficient and, second, an inquiry into whether Baker was prejudiced by the deficient performance.  The prejudice inquiry necessary for Baker's ineffective assistance of counsel claim overlaps substantially with the harmless error inquiry necessary for habeas relief stemming from trial errors such as erroneous jury instructions.  See Whitney v. Horn, 280 F.3d 240, 258 (3d Cir. 2002) (noting that the "ultimate issue" under Brecht standard for harmless error and Strickland standard of prejudice is "what effect, if any, the erroneous instruction had on the jury's verdict.") But because the prejudice standard may be conceptually slightly more rigorous than that of harmless error, see Kyles v. Whitley, 514 U.S. 419, 435-36 (1995), I will undertake a separate inquiry relating to prejudice.

### B.  Direct Due Process Challenge to Jury Instructions

#### 1.  Federal Due Process Requirements

As a general matter, states are free to define criminal offenses as they see fit.  Smith, 120 F.3d at 414.  "However, once the state has defined the elements of an offense, the federal

Constitution imposes constraints upon the state's authority to convict a person of that offense."
Id.  In particular, the Due Process Clause of the Fourteenth Amendment "protects the accused
against conviction except upon proof beyond a reasonable doubt of every fact necessary to
constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).
Accordingly, a "jury instruction that omits or materially misdescribes an essential element of an
offense as defined by state law relieves the state of its obligation to prove facts constituting every
element of an offense beyond a reasonable doubt, thereby violating the defendant's federal due
process rights." Smith, 120 F.3d at 415; see also Sandstrom v. Montana, 442 U.S. 510, 523
(1979).

　　　　Moreover, for jury instructions to be constitutionally defective, there must be a
"reasonable likelihood that the jury has applied the challenged instructions in a way that violates
the Constitution." Smith, 120 F.3d at 411 (emphasis in original) (quoting Estelle v. McGuire, 502
U.S. 62, 72 (1991) and Boyde v. California, 494 U.S. 370, 380 (1990)).  A court's analysis of the
instructions "must focus initially on the specific language challenged." Smith, 120 F.3d at 411.
After that, the "allegedly constitutionally infirm language must be considered in the context of
the charge as a whole." Id.  While the "reasonable likelihood" standard requires more than
showing that a single hypothetical "reasonable" juror could or might have interpreted the
instruction unconstitutionally, Hackett v. Price, 381 F.3d 281, 291 (3d Cir. 2004) (citing Boyde,
494 U.S. at 380), the petitioner is not required to show that each individual juror was reasonably
likely to be confused by the jury instructions.  Id. at 291 n.6.  The petitioner "need not establish
that the jury was more likely than not" to have applied the instructions in an unconstitutional
manner. Id. at 290-91.

## 2. Pennsylvania Law of First Degree Murder and Accomplice Liability

Pennsylvania's codified statutes clearly lay out the elements of all forms of homicide, including first degree murder.[27]  With limited exceptions not applicable here, a person is not guilty of any criminal offense under Pennsylvania law unless:

> he acted, intentionally, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense.

18 Pa. Cons. Stat. Ann. § 302(a).

"Criminal homicide" is a broad offense that includes murder, voluntary manslaughter, and involuntary manslaughter.  18 Pa. Cons. Stat. Ann. § 2501(b).  A person is guilty of the offense if he or she:

> intentionally, knowingly, recklessly or negligently causes the death of another human being.

18 Pa. Cons. Stat. Ann. § 2501(a).

 Pennsylvania's definition of first degree murder provides that it is a form of criminal homicide:

> A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa. Cons. Stat. Ann. § 2502(a).  Thus, specific intent to kill, the intention to accomplish the precise act of killing, is an element of first degree murder under Pennsylvania law.[28]

---

[27]Pennsylvania's statutes relevant to the elements of first degree murder have not been amended since the time of Baker's offense.  18 Pa. Cons. Stat. Ann. §§ 302, 306, 2501, 2502.

[28]By contrast, "a criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony," regardless of the defendant's intent to kill.  18 Pa. Cons. Stat. Ann. § 2502.

Pennsylvania's Supreme Court has held accordingly:

> [F]irst degree murder is distinguished from all other degrees of
> murder by the existence of a specific premeditated intent to kill
> harbored by the accused.  It is the presence, within the accused, of
> a fully formed purpose to take a life that must be proven before a
> conviction for first degree murder can be sustained.

Commonwealth v. Wayne, 720 A.2d 456, 464 (1998) (citations omitted); see also Laird v. Horn,

414 F.3d 419, 2005 WL 1668678 (3d Cir. July 19, 2005), at *1 n.3;  Smith, 120 F.3d at 410.

A person may be criminally liable under Pennsylvania law not only for his or her own

conduct, but also for the conduct of another person when he or she "is an accomplice of such

other person in the commission of the offense."  18 Pa. Cons. Stat. Ann. § 306(a)-(b).  A person

is an accomplice of another person in the commission of an offense if, inter alia:

> (1)  with the intent of promoting or facilitating the commission of
> the offense, he:
>
> > (i) solicits such other person to commit it; or
> >
> > (ii) aids or agrees or attempts to aid such other person in
> > planning or committing it.

18 Pa. Cons. Stat. Ann. § 306(c).  In addition, Pennsylvania's statute regarding accomplice

liability makes clear that:

> When causing a particular result is an element of an offense, an
> accomplice in the conduct causing such result is an accomplice in
> the commission of that offense, if he acts with the kind of
> culpability, if any, with respect to that result that is sufficient for
> the commission of the offense.

18 Pa. Cons. Stat. Ann. § 306(d).  See Commonwealth v. Flanagan, 854 A.2d 489, 493 n.2, 501

(Pa. 2004).  Thus, in the case of first degree murder, where intentionally causing the death of

another human being is an element of the offense, a person may be guilty as an accomplice only

if he or she shared with the primary actor the intent to cause the result of death.

The Pennsylvania Supreme Court has squarely held that specific intent to kill is an essential element of first degree murder, regardless of whether the defendant is charged based on the defendant's primary conduct or as an accomplice of another.  Commonwealth v. Bachert, 453 A.2d 931, 935 (Pa. 1982); Commonwealth v. Huffman, 638 A.2d 961, 963 (Pa. 1994).  Even where there is shared intent to enter into a conspiracy to commit a crime from which a killing was a natural and probable result, a defendant may not be convicted of first degree murder for such a killing under Pennsylvania law unless the killing was specifically intended by the defendant.  Smith, 120 F.3d at 410-11.

### 3.  Baker's Jury Instructions

Baker and his co-defendants were each charged with robbery, possession of an instrument of crime, criminal conspiracy, and murder.  The jury was presented with five possible verdicts with respect to murder: guilty of first degree murder, guilty of second degree murder, guilty of third degree murder, guilty of voluntary manslaughter, and not guilty.  Tr. Oct. 3, 1984 at 7.189.

Near the start of the instructions, the trial court instructed the jury to consider the evidence against each defendant separately:

> During your deliberations, you must consider each one of [the three verdict sheets] separately and you must discuss the evidence as it applies to each one of these defendants separately and you must note your verdict, whatever your verdict may be in that respect.

Id. at 7.187.

The trial court instructed the jury that it could find a defendant guilty based upon his own primary conduct or based upon the conduct of his codefendants under a theory of accomplice

69

liability:

> Under the law of Pennsylvania you may find the defendant guilty
> of a crime without finding that he personally engaged in the
> conduct required for the commission of that crime.  A defendant is
> guilty of a crime if he is the accomplice of other persons that
> commit that crime.  A defendant does not become an accomplice
> merely by being present at the scene.  He is an accomplice with the
> intention of promotion or facilitating in the commission of the
> crime or if he solicits, commands, encourages, aids, agrees to aid
> or attempts to aid the other person in planning or committing it.
> You may find the defendant guilty of a crime on the theory that he
> was an accomplice, as long as you are satisfied beyond a
> reasonable doubt that the crime was committed and that the
> defendant was an accomplice of the person who committed it.
> This extends even to a homicide in which there was a tendency of
> the natural and ponderable [sic[29]] consequences of the actions of
> the parties, even though homicide was not specifically
> contemplated by the parties.

Id. at 7.215-7.216.

In instructing the jury on homicide, the trial court stated:

> The term homicide refers to the taking of human life.  A homicide
> is a killing or causing of death by one human being of another
> human being.  It is a generic term that embraces every killing of
> one human being by another.  By generic, is meant it refers to a
> class of crimes and the term itself does not designate a particular
> crime.

Id. at 7.223.

───────────────

[29]The transcript indicates that the trial court used the phrase "natural and ponderable consequences." Tr. Oct. 3, 1984 at 7.216 (emphasis added).  Both parties suggest, without specifically addressing the possibility of error in the transcript, that Judge Sabo most likely used the word "probable" rather than "ponderable."  (Resp't's Reply Mot. Summ. J. at 29 (suggesting that instruction was borrowed from prior cases using words "natural and probable"); Pet. Mot. Summ. J. at 4 (incorrectly quoting trial transcript as reading "natural and probable").)  Indeed, it seems likely that the use of "ponderable" simply reflects an error in the transcript, as the word makes little sense in context.  For purposes of this opinion, I will assume, as the Commonwealth appears to have done, that the jury took the phrase to mean simply "the natural consequences." (See Resp. R. Pet. Mot. Summ. J. at 28-29.)

In subsequent instructions on the classes of criminal homicide, the trial court stated:

> It will be your duty in this case to determine whether William Gambrell died as a result of gunshot wounds inflicted upon him by the defendant, or whether the defendant was an accomplice of the person who actually inflicted the gunshot wounds resulting in the death of William Gambrell and if so whether such killing amounted to murder in the first degree, murder of the second degree, murder of the third degree or voluntary manslaughter.

Id. at 7.224.

The trial court's instruction on first degree murder provided:

> A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing. Thus, in order to find the defendant guilty of murder of the first degree, you must first find that the defendant caused the death of another person or that he was an accomplice of another person. That is, you must find that the defendant's act or the acts of an accomplice is the legal cause of the death of William Gambrell. And, thereafter, you must determine if the killing was intentional.

Id. at 7.229.

The court went on to explain what was meant by an intentional killing:

> [I]n order to find the defendant guilty of murder in the first degree, you must find that the killing was a willful, deliberate and premeditated act. You must ask yourself the question, did the defendant have the willful, deliberate and premeditated specific intent to kill at the time of the killing?

Id. at 7.230.

### 4. Reasonable Likelihood Analysis[30]

---

[30]The parties' briefs conflate the "reasonable likelihood" analysis with an analysis of "harmless error." "Reasonable likelihood" analysis, when a court considers whether it is reasonably likely that a jury applied erroneous or ambiguous instructions unconstitutionally, is relevant to the question whether the petitioner's constitutional rights were violated. Laird, 414 F.3d 419, 2005 WL 1668678, at *5-7; Smith, 120 F.3d at 411. Even if a petitioner's constitutional rights are violated, a court may only grant habeas relief for trial errors such as

### a.  Specific Language Challenged

Analysis of the specific instructions Baker challenges shows that the trial court relieved the Commonwealth of its burden of proving every element of first degree murder beyond a reasonable doubt.  The instructions allowed the jury to convict Baker of first degree murder without finding that Baker possessed the specific intent to kill.  The instructions at times flatly contradicted Pennsylvania law on first degree murder and accomplice liability and at other times were ambiguous in critical ways.

The trial court's errors began with its instructions on accomplice liability.  The court specifically instructed the jury that it could find the defendant guilty of "a homicide" as an accomplice if the homicide was a "tendency of the natural and ponderable consequences of the actions of the parties, <u>even though homicide was not specifically contemplated by the parties</u>." <u>Id.</u> at 7.216 (emphasis added).  As the trial court later explained, the term homicide "embraces every killing of one human being by another" and necessarily includes first degree murder.  <u>Id.</u> at 7.223-7.224. With these instructions, therefore, the trial court instructed the jury that it could find Baker guilty of first degree murder as an accomplice if it found: 1) first degree murder was committed by one of Baker's co-defendants; and 2) Baker was an accomplice with the co-defendant in a crime from which homicide was a natural consequence.  The trial court

---

erroneous jury instructions if the error is not "harmless error," i.e., the unconstitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 638.

     My analysis follows the pattern set forth by the Third Circuit in <u>Smith</u>, 120 F.3d at 411-19 and <u>Laird</u>, 414 F.3d 419, 2005 WL 1668678, at *5-9, in which the courts, in evaluating a direct challenge to erroneous jury instructions, first applied the "reasonable likelihood" standard to the jury instructions as a whole and then examined the entire trial record when conducting a "harmless error" analysis.

specifically negated the necessity of finding that Baker possessed the specific intent to kill.  By

contrast, Pennsylvania law provides that a defendant may be convicted of first degree murder as

an accomplice only if the defendant himself is found to have possessed the specific intent to kill.

Huffman, 638 A.2d at 963.  Moreover, Pennsylvania law requires that a general accomplice

charge, even if "legally correct on the law of accomplice liability, when given in conjunction

with a charge of first degree murder, must clarify for the jury that the specific intent to kill

necessary for a conviction of first degree murder must be found present in both the actual killer

and the accomplice."  Commonwealth v. Chester, 733 A.2d 1242, 1253 n.12 (Pa. 1999).  Thus,

not only did the trial court not clarify this aspect of Pennsylvania law, the court specifically

contradicted it.

 The Commonwealth argues that the trial court was referring only to the concept of felony

murder when it instructed the jury that it could find the defendant guilty of homicide as an

accomplice without finding that the crime was contemplated by the defendant.  The

Commonwealth cites a number of pre-1974 Pennsylvania Supreme Court cases which employed

similar language when describing co-conspirator liability in the felony murder context.  For

example, the Commonwealth relies on Commonwealth v. Thomas, 189 A.2d 255, 258 (Pa.

1963), where the Pennsylvania Supreme Court, in upholding a first degree murder conviction,

wrote:

> Where the existence of a conspiracy is established, the law imposes
> upon a conspirator full responsibility for the natural and probable
> consequences of acts committed by his fellow conspirator or
> conspirators if such acts are done in pursuance of the common
> design or purpose of the conspiracy.  Such responsibility. . .
> extends even to a homicide which is a contingency of the natural
> and probable execution of the conspiracy, even though such

homicide is not specifically contemplated by the parties.

Id.; see also Commonwealth v. Eiland, 301 A.2d 651, 653 (Pa. 1973) (quoting same language).

Undoubtedly, the Commonwealth is correct that Judge Sabo incorporated language from these or

similar cases into the accomplice liability instruction.  However, that is precisely the problem.

The decisions the Commonwealth cites were all written prior to the Pennsylvania legislature's

1974 amendments to the murder statute that excluded felony murder from murder in the first

degree, leaving only criminal homicides where the defendant possessed the specific intent to kill

within the classification of first degree murder.  18 Pa. Cons. Stat. Ann. § 2502, Historical and

Statutory Notes.  The 1974 amendments reclassified criminal homicides "committed while the

defendant was engaged as a principal or an accomplice in the perpetration of a felony" as murder

in the second degree.  Id. at § 2502.  Thus, prior to 1974, it might have been permissible for a

trial court in its general accomplice liability instructions to instruct the jury that it might find the

defendant guilty as an accomplice to all forms of homicide that stem as a natural and probable

consequence from the actions of the defendant and another, even where the parties did not

specifically contemplate killing.  But Judge Sabo instructed the jury in 1984, ten years after the

1974 amendments.  In 1984, such a broad instruction contradicted the law because, under the law

at that time, a defendant could be found guilty of first degree murder only if found to possess the

specific intent to kill.

The Commonwealth's argument that the jury would have interpreted the trial court's

reference to a "homicide. . . not specifically contemplated by the parties" as a reference to one

form of criminal homicide, second degree murder, but not another, first degree murder, is

unpersuasive.  The trial court specifically instructed the jury that the term "homicide" "embraces

every killing of one human being by another" and that criminal homicide includes "three types of murder, murder of the first degree, murder of the second degree and murder of the third degree." Jurors are presumed to follow the court's instructions. <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000). Furthermore, the jury cannot be expected to know when an incorrect instruction is given. <u>See</u> <u>Whitney</u>, 280 F.3d at 257 ("It is unreasonable and improper to assume that lay persons can recognize that an incorrect standard of proof has been described in a jury instruction.").

The error in the court's instruction on accomplice liability was magnified by the court's ambiguity in instructing the jury on the classes of criminal homicide. The court instructed the jury to determine if the "defendant was an accomplice of the person who actually inflicted the gunshot wounds resulting in the death of William Gambrell and if so whether such <u>killing</u> amounted to murder in the first degree, murder of the second degree, murder of the third degree or voluntary manslaughter." Tr. Oct. 3, 1984 at 7.229 (emphasis added). In effect, the court instructed the jury to make two separate inquiries: 1) whether the individual who shot William Gambrell committed first, second, or third degree murder; and 2) whether the defendant was an accomplice of that person as to any crime. <u>See</u> <u>Laird</u>, 414 F.3d 419, 2005 WL 1668678, at *6-7. The court had previously instructed the jury that it need not find that the defendant possessed the specific intent to kill in order to find him guilty as an accomplice. This instruction indicated that an accomplice is guilty of first degree murder as long as the killing itself was first degree murder, no matter what the state of mind of the accomplice. <u>Id.</u>

The trial court solidified the effect of these errors when it erroneously instructed the jury on first degree murder:

> Thus, in order to find the defendant guilty of murder of the first

> degree, you must first find that the defendant caused the death of
> another person or that he was an accomplice of another person.
> That is, you must find that the defendant's act or the acts of an
> accomplice is the legal cause of the death of William Gambrell.
> And, thereafter, you must determine if the killing was intentional.

Tr. Oct. 3, 1984 at 7.229.  Once again, this instruction directed the jury to make two separate

inquiries: one regarding the intentionality of the killing itself and another regarding whether the

defendant was an accomplice, in some sense, of the individual who committed the killing.  The

instruction, especially following as it did the trial court's prior erroneous instruction on

accomplice liability, allowed the jury to find an accomplice guilty of first degree murder,

regardless of the accomplice's state of mind, as long as the killing itself was intentional.

Indeed, the Pennsylvania Supreme Court later found a nearly word-for-word identical

instruction given by the same trial judge to be an "outright misstatement of the law on a

fundamental issue relating to culpability" and, "quite simply, a patently erroneous statement of

the law." Commonwealth v. Huffman, 638 A.2d 961, 962 (Pa. 1994).[31]  In Huffman, the

Pennsylvania Supreme Court reversed a first degree murder conviction stemming from a violent

burglary because under the nearly-identical instruction, "the jury needed to find only that the

[defendant] had conspired to commit or assisted in a burglary with the actual murderer in order to

find him guilty [of first degree murder]."  Id. at 963.  Therefore, "the Commonwealth was

---

[31] The equivalent instruction in Huffman read:
> Thus, in order to find a Defendant guilty of murder in the first
> degree, you must find that the Defendant caused the death of
> another person, or that an accomplice or co-conspirator caused the
> death of another person.  That is, you must find that the
> Defendant's act or the act of an accomplice or co-conspirator is the
> legal cause of death of [the victim], and thereafter you must
> determine if the killing was intentional.

638 A.2d at 962.

76

improperly relieved of its burden of proving beyond a reasonable doubt a critical element of the crime of first degree murder, that the [defendant] possessed the specific intent to kill." Id. Likewise, in this case, to comply with the trial court's instructions and find Baker guilty of first degree murder, the jury needed only to find that Baker was an accomplice to the robbery with the actual murderer. This, of course, is inconsistent with Pennsylvania law which requires that a defendant only be convicted of first degree murder if found to have possessed the specific intent to kill.

### b.  Instructions as a Whole

In addition to particular disputes regarding the interpretation of the challenged portions of the instructions described above, the Commonwealth also argues that the trial court's instructions as a whole were not reasonably likely to be applied by the jury in an unconstitutional manner because: (1) the trial court instructed the jury to consider each element of each crime against each defendant separately, Tr. Oct. 3, 1984 at 7.187-7.189; (2) the trial court instructed the jury that it could find that a defendant possessed the necessary state of mind for a particular crime based on reasonable inferences and circumstantial evidence, but only if the evidence established the state of mind beyond a reasonable doubt, id. at 7.200-7.201; and (3) the trial court instructed the jury that one "is an accomplice with the intention of promotion or facilitating in the commission of the crime." Id. at 7.216.

Viewing the jury instructions as a whole, the Commonwealth's arguments are unconvincing. First, while the trial court did instruct the jury that it must consider each element of the crime against each defendant separately, the very concept of accomplice liability allows the jury to find an accomplice guilty of the same crime as the principal actor even if only the

principal actor fulfilled certain of the elements.  The question at hand is whether the jury understood that for purposes of first degree murder it <u>could</u> attribute a killing to an accomplice even if the accomplice did not actually perform the killing, but <u>could not</u> attribute the actual killer's specific intent to kill to an accomplice without independently finding that the accomplice shared the specific intent to kill.  The trial court effectively instructed the jury that it could attribute the specific intent of the actual killer to an accomplice without an independent finding of specific intent on the part of the accomplice, or, alternatively, that it need not consider the accomplice's intent at all, in contravention of Pennsylvania law, and in violation of Baker's right to due process.

It is likewise beside the point that the trial court instructed the jury that it could only find that a defendant possessed a required state of mind for an offense if the prosecution had proven the state of mind beyond a reasonable doubt.  <u>Id.</u> at 7.200-7.201.  Such an instruction is, of course, an accurate instruction on the law so far as it goes.  However, Baker does not challenge the trial court's characterization of the burden of proof necessary to find that a defendant possessed a required state of mind.  Baker challenges the trial court's failure to instruct the jury that specific intent is a required state of mind for first degree murder.  The unremarkable instruction to which the Commonwealth points does nothing to counteract the effect of the trial court's prior erroneous and ambiguous instructions in that regard.

Finally, the Commonwealth mistakenly relies on the trial court's instruction defining accomplice liability.  The portion of the accomplice liability instruction that the Commonwealth relies on is, as reflected in the record, grammatically flawed and capable of multiple interpretations.  The instruction reads:

He is an accomplice with the intention of promotion or facilitating in the commission of the crime or if he solicits, commands, encourages, aids, agrees to aid or attempts to aid the other person in planning or committing it.

Id. at 7.216.  The statutory definition Judge Sabo was apparently referencing reads:

A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it . . . .

18 Pa. Cons. Stat. Ann. § 306(c).  Thus, a modification of the trial court's instruction that roughly tracks the statutory definition would read:

He is an accomplice [*if:*]

with the intention of promotion or facilitating in the commission of the crime[,~~or if~~]

he solicits, commands, encourages, aids, agrees to aid or attempts to aid the other person in planning or committing it.

Tr. Oct. 3, 1984 at 7.216 (bracketed and emphasized "if:" inserted; bracketed "or if" shown eliminated).  As shown above, in order to track the statute, one must alter the instruction in two ways: 1) insert the word "if" between the words "accomplice" and "with the intention;" and 2) eliminate the words "or if" between the words "crime" and "he solicits."

The Commonwealth interprets the trial court's instruction to mean that the jury could find the defendant guilty as an accomplice *if* he possessed "the intention" to promote or facilitate the

crime *or if* the defendant otherwise aided or assisted the principal actor in its planning or

commission.[32]  (Resp't's Reply Mot. Summ. J. at 27.)  The Commonwealth thereby implicitly

argues that the jury would have understood the instruction to contain what amounts to the first of

the two alterations necessary to track the statute.  Even under the Commonwealth's

interpretation, the instruction is inconsistent with the statutory definition of accomplice liability,

which clearly requires that a defendant intend to promote or facilitate the crime *and also* that he

aid or assist in the crime.  18 Pa. Cons. Stat. Ann. § 306(a).  More importantly, without

explanation, the Commonwealth effectively inserts a conditional clause into the instruction

between "He is an accomplice" and "with the intention," thereby allowing for an interpretation

that includes intent as an element of accomplice liability.

As actually transcribed, however, the instruction is equally, if not more, likely to be

interpreted as an instruction that one is by definition an "accomplice with the intention" to

promote or facilitate a crime *if* one aids or assists in the crime.  This interpretation requires only

---

[32]The Commonwealth's precise characterization of the instruction is:
> Judge Sabo specified that a person was considered to be an
> accomplice only if the person separately possessed 'the intention'
> to promote or facilitate the crime, or otherwise aided or assisted the
> principal actor in its planning or commission.

(Resp't's Reply Mot. Summ. J. at 27.)
> A modified version of the instruction as the Commonwealth interprets it would read:
> He is an accomplice [*if he possesses*] [~~with~~] the intention of
> promotion or facilitating in the commission of the crime or if he
> solicits, commands, encourages, aids, agrees to aid or attempts to
> aid the other person in planning or committing it.

Tr. Oct. 3, 1984 at 7.216 (bracketed and emphasized "if he possesses" inserted; bracketed "with"
shown eliminated).

that the jury overlook the word "or" between "commission of the crime" and "if he solicits."[33]

Under such an interpretation, the instruction is tantamount to an instruction for the jury to

presume intent if it finds that the defendant solicited, commanded, encouraged, aided, agreed to

aid or attempted to aid another in the crime.  Baker does not rely on this particular instruction as

an independent basis for arguing that the Commonwealth was relieved of its burden of proving

Baker's specific intent beyond a reasonable doubt.  However, the instruction hardly acts to

remedy the effects of the trial court's other erroneous instructions regarding accomplice liability,

as the Commonwealth argues it does.

Moreover, even had the trial court provided a definition of accomplice liability not

inconsistent with Pennsylvania law at this point in the instructions, the trial court indisputably

failed to clarify to the jury that an accomplice must share the specific intent to kill with the

principal in order to be convicted of first degree murder.  This itself violates Pennsylvania law

because it makes it impermissibly likely that the jury will convict a defendant of first degree

murder without finding specific intent to kill.  <u>Chester</u>, 733 A.2d at 1253 n.12.  As the

Pennsylvania Supreme Court has noted:

> A general accomplice charge, while legally correct on the law of
> accomplice liability, when given in conjunction with a charge of
> first degree murder, must clarify for the jury that the specific intent
> to kill necessary for a conviction of first degree murder must be
> found present in both the actual killer and the accomplice.

---

[33]A modified instruction under this interpretation would read:
> He is an accomplice with the intention of promotion or facilitating
> in the commission of the crime [or] if he solicits, commands,
> encourages, aids, agrees to aid or attempts to aid the other person
> in planning or committing it.

Tr. Oct. 3, 1984 at 7.216 (bracketed "or" shown eliminated).

Id.  Again, the jury was reasonably likely to interpret even an otherwise technically correct

instruction on accomplice liability to mean that to convict an accomplice of first degree murder,

the accomplice need only have the intent to commit robbery, so long as a killing resulted.

Huffman, 638 A.2d at 964; Laird, 414 F.3d 419, 2005 WL 1668678, at *6-7; Smith, 120 F.3d at

411-12.  In light of the trial court's immediately subsequent instruction that the accomplice need

not have intended to kill so long as killing was a natural consequence of the underlying crime, it

is reasonably likely that the jury believed that a defendant could be found guilty of first degree

murder so long as the defendant intended to commit a robbery with the eventual actual murderer.

The simple fact is that the trial court never instructed the jury that to convict an accomplice of

first degree murder, the jury must find beyond a reasonable doubt that the accomplice had a

specific intent to kill.[34]

      Viewing the challenged instructions both individually and in the context of the entire jury

instructions, there is a reasonable likelihood that the jury applied the court's instructions in a way

_____

[34]I also note that the likelihood that the jury applied the court's instructions in an
unconstitutional manner was increased by the fact that the prosecution's closing argument
prepared the jury to make such an application.  The prosecution blatantly misstated the law in its
final argument to the jury:

> Ladies and gentleman, if one of the people is guilty of murder, of
> murder in the first degree, then through the conspiracy and the
> agreement, all of them are.  Because, if one of the three developed
> an intent to kill, either before or during the crime, than all three of
> them are responsible and guilty for that intent to kill.

Tr. Oct. 3, 1984 at 7.161-62.  The prosecution told the jurors that they could find all three of the
defendants guilty of first degree murder as long as one of them developed the specific intent to
kill.  The jury was thereby primed for the trial court's erroneous instructions regarding
accomplice liability.  See Smith, 120 F.3d at 419.

      The trial court expressed an inaccurate understanding of the law when it responded to
Baker's co-defendant's counsel's objection to the prosecution's remarks regarding intent and first
degree murder.  The trial court stated that "if you are an accomplice of a person who intends to
kill, you are equally able [sic] with that intent."  Tr. Oct. 3, 1984 at 7.169.

that relieved the prosecution of its burden of establishing beyond a reasonable doubt that Baker individually had the specific intent to kill.  These instructions "operated to lift the burden of proof as to an essential element of the offense as defined by state law," Smith, 120 F.3d at 416, and therefore the instructions rose to the level of constitutional error in violation of the Due Process Clause of the Fourteenth Amendment. See also Bronshtein, 404 F.3d at 710-12; Laird, 414 F.3d 419, 2005 WL 1668678, at *6-7.

### 5. Harmless Error Analysis

To succeed on his direct due process claim in the habeas context, Baker must establish that the errors in the jury instructions were not "harmless errors." Brecht, 507 U.S. at 638.  Baker must show that the erroneous instructions had a "substantial and injurious effect or influence in determining the jury's verdict."  Id.; Smith, 120 F.3d at 417; Laird, 414 F.3d 419, 2005 WL 1668678, at *7.  In applying this standard:

> [the] crucial inquiry is the impact of the error on the minds of the jurors in the total setting.  It is thus inappropriate to ask whether there was sufficient evidence to support the result, apart from the phase of the trial affected by the error.  The correct inquiry is whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error.

Smith, 120 F.3d at 418 (quoting Yohn v. Love, 76 F.3d 508, 523 (3d Cir. 1996)).

As already explained, the jury instructions permitted the jury to convict Baker of first degree murder as either an accomplice or as a principal actor.  The accomplice liability instructions erroneously permitted the jury to convict Baker of first degree murder as an accomplice without finding that Baker possessed the specific intent to kill, but there was no error in the principal liability instructions. Therefore, the error in the instructions could only have

impacted Baker's verdict if it is possible that the jury convicted Baker as an accomplice and not as the principal actor. The jury verdict, by its terms, did not indicate whether Baker was convicted as an accomplice or a principal.

A review of the trial evidence shows that there was contradictory evidence regarding the identity of the shooter. Only one trial witness, Thomas Dolan, identified Baker as the actual shooter. Commonwealth v. Baker II, 614 A.2d at 669. The defense presented evidence showing that when presented with a photo array not containing Baker's photograph, Dolan initially identified another individual as the shooter. Tr. Oct. 1, 1984 at 5.64; Commonwealth v. Baker II, 614 A.2d at 667. Reviewing a seven-picture photo array at a later date, Dolan picked out Baker's photograph and stated that the only picture he recognized "is this guy here." Tr. Oct. 1, 1984 at 5.59. Dolan stated at that point that "he looks like the short guy, the one that did the shooting." Id. at 5.59-5.60.

In addition, the jury was presented with evidence showing that Dolan had only a limited opportunity to see the shooter's face. Dolan testified that when the shooter came into his office, the shooter immediately proceeded to Dolan's side and to his back. Tr. Sept. 25, 1984 at 2.67. Thus, Dolan only had a brief period to see the shooter's face. After that, the shooter remained to Dolan's side or behind him and Dolan did not have another opportunity to see the shooter's face in full. Id. at 2.69-2.81. Indeed, Dolan testified that he was unable to see if Baker had a gun at the time the shots were fired at Gambrell. Id. at 2.89. Aside from Dolan's testimony, there was no evidence identifying Baker as the shooter. The murder weapon was never recovered and there was no scientific or physical evidence indicating that Baker was the shooter. Commonwealth v. Baker II, 614 A.2d at 665.

84

Furthermore, there was other trial evidence contradicting Dolan's testimony.  The Commonwealth introduced Baker's statement to the police in which Baker stated that co-defendant Joseph fired over Baker's shoulder and killed the victim.  Tr. Sept. 28, 1984 at 4.66; Commonwealth v. Baker II, 614 A.2d at 665.  The statement indicated that Baker's co-defendants planned to blame Baker for the shooting because Baker did not have a prior record.  Tr. Sept. 28, 1984 at 4.70.  The Commonwealth also presented evidence that several days after the killing Joseph had possession of a weapon that fired .38 caliber bullets, the same type of bullet used to kill Gambrell.  Id. at 4.147-4.182; Commonwealth v. Baker II, 614 A.2d at 670-71.  Additionally, in closing argument, Baker's defense counsel called into question Dolan's identification of Baker.  Tr. Oct. 4, 1984 at 7.81-7.83.  Therefore, it is possible, and as I decide infra in the context of Baker's related ineffective assistance of counsel claim, reasonably probable that the jury convicted Baker as an accomplice.

It is also possible, and indeed, as discussed infra, reasonably probable, that the jury would not have found that the Commonwealth had proven beyond a reasonable doubt that Baker, acting only as an accomplice, possessed the specific intent to kill.  There was contradictory trial evidence regarding Baker's intent.  Baker's statement, which the Commonwealth introduced, indicated that Baker intended to act only as a lookout while the robbery took place.  Tr. Sept. 28, 1984 at 4.63-4.65.  His statement also indicated that he was reluctant to participate in the crime because he knew someone who worked in the office.  Id.  Further, Baker presented a character witness that spoke to Baker's good reputation in the community for being a peaceful, law-abiding citizen.  Tr. Oct. 2, 1984 at 6.118.

As the Commonwealth notes, there was sufficient evidence from which the jury could

have inferred that the non-shooters in the crime specifically intended to kill; but this, of course, is

not the relevant inquiry.  Smith v. Horn, 120 F.3d 400, 418 (3d Cir. 1997); Laird, 414 F.3d 419,

2005 WL 1668678, at *8.  In Smith, the Third Circuit considered a similar set of instructions and

evidence and found that the erroneous jury instructions were not harmless under Brecht.[35]  120

---

[35]In Smith, the petitioner, Smith, had been convicted of first degree murder and other crimes stemming from his involvement, with an accomplice, Alston, in the armed robbery of a pharmacy.  120 F.3d at 404. One of the robbery victims was killed after sustaining a gunshot wound to the head.  Id.
> The trial court's instructions on accomplice liability read:
>> [A]n accomplice is a person if with the intent of promoting or facilitating the commission of a crime he solicits, commands, encourages or requests the other person or persons to commit that crime or crimes, or aids, agrees to aid, or attempts to aid the other person in the planning or committing the [sic] crime.

Id. at 413-14.
> The trial court further instructed that:
>> If, and I emphasize this, you find that one was the accomplice of the other and that one of the two actually performed the killing, you, the jurors, need not agree on the role or roles played by the respective parties;  that is, by this defendant and his accomplice, if you find that that was the position of both, provided that each of you is satisfied that the crime was actually perpetrated by the defendant or by the accomplice of the defendant.

Id. at 412.
> The trial court instructed the jury on first degree murder as follows:
>> [T]he elements of first degree murder are the unlawful killing of another person done intentionally;  that is, willfully, deliberately and with premeditation, plus malice, as I will define that term to you.  If these elements have been established beyond a reasonable doubt, you may, on the theory that one was the perpetrator and the other the accomplice, find Clifford Smith guilty of murder in the first degree. . . .

Id. at 411.
> The Third Circuit concluded that the instructions "blurred the distinction between 'accomplice in the robbery' and 'accomplice in the killing,' leading the jury to believe that an accomplice for one purpose is an accomplice for all purposes."  Id. at 412.  Therefore, it was reasonably likely that the jury would have believed that "intent on the part of Alston to kill, coupled with Smith's participation in the robbery, rendered Smith guilty of first-degree murder."  Id. at 413.  Consequently, the Third Circuit found a "reasonable likelihood that the jury

F.3d 400.  The Third Circuit rejected the Commonwealth's argument that the error was harmless because there was evidence that Smith was the actual shooter and no evidence that his co-defendant was the shooter.  Id. at 418.  Indeed, the court noted that it was likely that Smith was the shooter.  Id.  But the Third Circuit reasoned that the effect of the erroneous instructions was to narrow the jury's focus so substantially as to make it questionable whether a reasonable jury would endeavor to answer the difficult question of which co-defendant actually committed the killing.  Id. at 419.  Rather, the jury instructions allowed the jury to simply rest upon the relatively straightforward finding that the petitioner had participated in the robbery and that either petitioner or his co-defendant had committed an intentional killing.  Id.  Furthermore, the court emphasized that the closing remarks of the prosecutor had urged the jury that it need not consider whether the petitioner had actually killed the victim.  Id.  The court reasoned that "[h]aving repeatedly urged the jury to base its verdict on a theory predicated on a fundamental constitutional error, the Commonwealth cannot now seriously contend that the error had no 'substantial and injurious effect or influence' on the verdict."[36]  Id.  The Smith court concluded that the error was not harmless.  Id.

---

understood the charge as imposing upon the Commonwealth no burden of proving that Smith intended for the victim to die in order to convict Smith of first-degree murder."  Id. at 414.

[36]The prosecutor in Smith stated to the jury in closing argument:

It doesn't make one bit of difference who shot [the victim], because *if you find as a fact*, and I suggest you can based on the evidence, *that [the victim] was killed by either [petitioner's co-defendant] or [the petitioner], you can find as a fact that there was murder in the first degree.*  It makes no difference who pulled the trigger.  *The acts of one accomplice are the acts of the other. The doings of one are the doings of the other*. . . .

Smith, 120 F.3d at 404 (emphasis in opinion).

In Baker's trial, as in <u>Smith</u>, the trial court's instructions allowed the jury to find the petitioner guilty of first degree murder on the basis that either he or a co-defendant intentionally killed the victim.  In both trials, there was contradictory evidence regarding the identity of the actual shooter, but nevertheless sufficient evidence to find that the defendant-petitioner was the shooter.  In fact, in <u>Smith</u>, the evidence showing that Smith was the shooter was far stronger than the evidence against Baker and included presentation to the jury of Smith's statements admitting the shooting.  In Baker's trial, as in <u>Smith</u>, the prosecutor blatantly urged the jury to apply an erroneous theory of accomplice liability for first degree murder.

In both Baker's case and in <u>Smith</u>, the erroneous instructions permitted the jury to evade the more difficult questions of who was the actual shooter, and which, if any, of the accomplices, possessed the specific intent to kill.  The instructions allowed the jury simply to decide that it was clear beyond a reasonable doubt that all defendants were at least accomplices, as defined by the trial court, and that one of the defendants intentionally killed the victim.  The erroneous instructions allowed the jury to end its deliberations there, convicting all defendants of first degree murder without an inquiry into whether the accomplices shared the specific intent to kill with the principal actor.  Therefore the erroneous instructions had a "substantial and injurious effect on the jury's verdict."[37]

---

[37]The Commonwealth makes the questionable argument that "the fact that the jury later determined petitioner's sentence to be *death*, while imposing a life sentence on his co-defendants, is an objective indication that the jurors did not believe him to be a mere accomplice to the murder, but the principal actor." (Resp't's Surreply Mot. Summ. J. at 9 (emphasis in original); Resp't's Reply Mot. Summ. J. at 17.)  The jury sentenced Baker to death because it found Baker's three aggravating circumstances to outweigh his two mitigating circumstances. First Degree Murder Verdict Penalty Determination Sheet, <u>Commonwealth v. Baker</u>, No. 514-520 (Pa. Ct. Comm. Pl. Oct. 5, 1984).

The Third Circuit's recent decisions in Bronshtein v. Horn, 404 F.3d 700 (3d Cir. 2005), and Laird v. Horn, 414 F.3d 419, 2005 WL 1668678 (3d Cir. July 19, 2005), also support, and indeed, require, a conclusion that the error in Baker's trial was not harmless.  Bronshtein well illustrates a situation in which a court could confidently conclude that a similar instruction was harmless or non-prejudicial.  In Bronshtein, the petitioner had been convicted in a Pennsylvania court of, inter alia, first degree murder, robbery, and conspiracy to commit murder.  404 F.3d at 704.  Under a literal reading of the jury instructions in Bronshtein's case, the jury could convict Bronshtein of first degree murder under a theory of co-conspirator liability if it found that he had conspired to commit the robbery and that another conspirator had committed a killing in furtherance of the robbery.[38] Id. at 711.  The Third Circuit concluded that there was a reasonable probability that the jury "could have proceeded on the incorrect belief that a specific intent to kill was not needed in order to convict Bronshtein of first degree murder on the theory of co-conspirator liability."  Id. at 712.  However, the Third Circuit found this to be harmless error under Brecht because the jury's concomitant finding that Bronshtein was guilty of conspiracy to commit murder left no doubt that the jury concluded that Bronshtein possessed the specific intent to kill.  Id. at 712-15.  This was so because the trial court clearly instructed the jury that in order to convict Bronshtein of conspiracy to commit murder, it must find that Bronshtein participated in the planning or the commission of the crime of murder and that he did so with the intent of

_____

[38]Bronshtein differs from Baker's case in that the instructional error in Bronshtein was only found in the instructions on co-conspirator liability and not in the instructions on accomplice liability.  404 F.3d at 712.  In Bronshtein, "the instructions on liability as a principal or accomplice stressed the need to find a specific intent to kill" for a first degree murder conviction and were constitutionally compliant.  Id.  In Baker's case, the accomplice liability instructions were flawed and the trial court did not separately instruct the jury on co-conspirator liability.

promoting or facilitating the commission of the crime of murder.  Id. at 713-14.  The jury must,

therefore, have found that Bronshtein possessed the specific intent to kill as a prerequisite to

finding Bronshtein guilty of conspiracy to commit murder.  Id.  Thus, "[e]ven if the jury based

[the first degree murder] verdict on the theory of co-conspirator liability, and even if the jury

proceeded on the erroneous belief that this theory did not require proof of a specific intent to kill,

the jury's verdict on the charge of conspiracy to commit murder shows that the jury found that

Bronshtein had that intent."  Id. at 714.

      The facts of Baker's case stand in stark contrast to those of Bronshtein.  Baker, unlike

Bronshtein, was convicted only of general criminal conspiracy, not specifically of conspiracy to

commit murder.  Commonwealth v. Baker II, 614 A.2d at 665; Bronshtein, 404 F.3d at 712-13

n.6.  Nothing in Baker's jury instructions or the verdict form indicates that by finding Baker

guilty of criminal conspiracy, the jury necessarily found Baker guilty of conspiracy to commit

murder.  Tr. Oct. 3, 1984 at 7.243-7.244.  The trial court in Baker's case instructed the jury:

> In order to find the defendant guilty of conspiracy to commit
> robbery and/or murder, you must be satisfied initially that the
> following two elements of the conspiracy have been proven beyond
> a reasonable doubt. First that the defendant agreed with one or
> more persons, that they engaged in conduct to commit the crimes
> of robbery or murder or agreed to aid one another in the
> commission of the crimes of robbery and/or murder.
>         And, secondly, at the time the defendant did so with the
> intent to promote or facilitate the commission of the crimes of
> robbery and/or murder.
> . . .
> . . . The heart of the offense of criminal conspiracy is the common
> understanding, no matter how it comes into being, that that the
> participants are joined together to perpetrate an unlawful act. . . . I
> charge you that if you find that the Commonwealth has proven
> beyond a reasonable doubt that the defendants entered into such an
> agreement with each other for the purpose of furthering the crimes

> of robbery, and/or murder and that an overt act was done in the
> p[u]rsuance of the conspiracy, then you should find the defendants
> guilty of criminal conspiracy.  Otherwise you must find the
> defendants not guilty of criminal conspiracy.

Id. at 7.244-7.247 (emphasis added).  The verdict form simply listed the charges: "Possession

Instrument of Crime," "Robbery," "Criminal Conspiracy," and "Murder." Verdict Report,

Commonwealth v. Baker, No. 514-520 (Oct. 4, 1984).  The court took Baker's criminal

conspiracy verdict as follows:

> THE CRIER:          On Bill of Information 518 of the April
>                     Term, 1984, charging Herbert Baker with
>                     criminal conspiracy, what is your verdict?
>
> JURY FOREMAN:   Guilty.

Tr. Oct. 4, 1984 at 8.8-8.9.  Baker was thus charged and convicted of general criminal

conspiracy, not of a specific charge of conspiracy to commit murder.  It therefore does not follow

that the jury must have found that Baker possessed the specific intent to kill in the course of

finding Baker guilty of criminal conspiracy.   The jury may well have simply ended its

deliberations regarding criminal conspiracy once it determined that Baker conspired to commit

robbery.

By contrast, the trial court in Bronshtein presented the charges of conspiracy to commit

murder, conspiracy to commit robbery, and conspiracy to commit theft, as separate and distinct

charges.  Bronshtein, 404 F.3d at 712-13 n.6. In a supplemental instruction, the trial court in

Bronshtein instructed the jury specifically with respect to conspiracy to commit murder:

> [I]n order to find the defendant guilty of conspiracy to commit
> murder, you must be satisfied that two elements of the conspiracy
> have been proven beyond a reasonable doubt: First, that the
> defendant agreed to aid another person. . . in either planning or the

> commission of the <u>crime of murder</u>. . . .  Second, that the defendant
> did so with the intent of promoting or facilitating the commission
> of the <u>crime of murder</u>.

<u>Id.</u> at 713 (emphasis added).  And it was abundantly clear from the verdict itself that the jury

found Bronshtein guilty on the specific charge of conspiracy to commit murder:

| | |
|---|---|
| Court clerk: | How say you on 3279-93.5, second count, criminal conspiracy, conspiracy to commit murder? |
| Presiding Juror: | Guilty. |
| Court Clerk: | How say you on conspiracy to commit to robbery? |
| Presiding Juror: | Guilty. |
| Court Clerk: | How say you on conspiracy to commit theft? |
| Presiding Juror: | Guilty. |

<u>Id.</u> at 712-13 n.6.  Indeed, the Third Circuit highlighted the distinction between situations where

a defendant is convicted specifically of conspiracy to commit murder and situations where a

defendant's criminal conspiracy conviction may be based on conspiracy to commit a separate

crime.  <u>Bronshtein</u>, 404 F.3d at 714 n.8; <u>compare Wayne</u>, 720 A.2d at 633 (erroneous first degree

murder co-conspirator instruction harmless where defendant's related criminal conspiracy

conviction necessarily founded on conspiracy to commit murder[39]) <u>with Huffman</u>, 638 A.2d at

_____

[39] In <u>Commonwealth v. Wayne</u>, 720 A.2d 456 (Pa. 1998) (discussed in <u>Bronshtein</u>, 404 F.3d at 714-15), the defendant was convicted of criminal conspiracy, but it was clear that the conspiracy "had only one object, the deliberate decision to take a life."  <u>Wayne</u>, 720 A.2d at 465. The conspiracy in <u>Wayne</u> "was a conspiracy to kill."  <u>Id.</u>  Therefore, even though the jury instructions in <u>Wayne</u> technically permitted the jury to convict the defendant of first degree murder without finding that the defendant possessed the specific intent to kill, that error was harmless in light of the conspiracy conviction because once the jury "determined that [the defendant] was guilty of conspiracy, given the sole object of that conspiracy, the only logical

963 (erroneous first degree murder accomplice liability instruction not harmless where related criminal conspiracy conviction may have been founded on conspiracy to commit burglary).

Moreover, even had Baker been simultaneously convicted of a specific charge of conspiracy to commit murder, that would still not necessarily render the error harmless. In Laird, even though the petitioner, like the petitioner in Bronshtein, had been convicted both of first degree murder and conspiracy to commit murder, the Third Circuit ruled that the error in Laird's accomplice liability instructions was not harmless. Laird, 414 F.3d 419, 2005 WL 1668678, at *7-9. In response to the Commonwealth's position that the evidence at trial overwhelmingly established that the petitioner, Laird, had intentionally killed the victim, the Third Circuit noted that there was contradictory evidence and wrote:

> Although there is clearly sufficient evidence to sustain [the Commonwealth's] position, we can not substitute ourselves for the jury by speculating about what portion of the testimony the jury believed.

Laird, 414 F.3d 419, 2005 WL 1668678, at *8. Emphasizing that the state trial court "did not explain that a co-conspirator can not be convicted of first degree murder absent a shared specific intent to kill," the Third Circuit in Laird distinguished Bronshtein on the ground that the petitioner in Bronshtein had been convicted of only one form of murder, first degree murder, but the petitioner in Laird had been convicted of first, second, and third-degree murder.[40]  Laird, 414

conclusion to reach is that this jury also determined, beyond a reasonable doubt, that [the defendant] possessed the specific intent to kill." Id.

[40]The Laird court also emphasized that the trial court in Bronshtein had provided an accurate instruction of the law as to accomplice liability.  Laird, 414 F.3d 419, 2005 WL 1668678, at *9.  In Baker's case, of course, like in Laird, the trial judge did not provide an accurate instruction on accomplice liability.

F.3d 419, 2005 WL 1668678, at *9.  Therefore, the <u>Laird</u> court reasoned, there was no way "to determine if the jury understood that an accomplice to a first degree murder must also intend to kill the victim."  <u>Id.</u>

The fine distinction between <u>Laird</u> and <u>Bronshtein</u> is irrelevant to Baker's case because, as explained above, Baker was convicted only of general criminal conspiracy and was not convicted of conspiracy to commit any form of murder.  It is therefore inconsequential whether Baker was convicted of first degree murder alone, or also of second and third-degree murder.  In Baker's case, as in <u>Laird</u>, there may have been sufficient evidence to convict Baker of first degree murder, but the evidence was not uncontradicted.  <u>Laird</u>, 414 F.3d 419, 2005 WL 1668678, at *8. As in <u>Laird</u>, one witness testified that Baker was the principal actor, but Baker presented contradictory evidence. <u>Id.</u>  In the face of contradictory evidence such as this, a federal judge cannot substitute herself "for the jury by speculating about what portion of the testimony the jury believed."  <u>Id.</u>

In situations such as those described in <u>Bronshtein</u> and in <u>Wayne</u>, even though a defendant may otherwise have been deprived of his Fourteenth Amendment right to require the Commonwealth to prove beyond a reasonable doubt every element of the charge of first degree murder, a court can comfortably conclude that such errors are harmless and non-prejudicial because the court can look to a separate verdict that establishes that the jury found beyond a reasonable doubt that the defendant possessed the omitted element of intent.  There was no such separate verdict in <u>Laird</u>, nor is there in Baker's case.  "It was for the jury, not a court, to determine the identity and <u>mens rea</u> of the actual killer." <u>Laird</u>, 414 F.3d 419, 2005 WL 1668678, at *8.  It is reasonably likely that the jury did not undertake the difficult inquiry as to whether the

accomplices possessed the specific intent to kill in Baker's case.  Consequently, as in <u>Laird</u>, there is no way to eliminate the "grave doubt as to the harmlessness of the error" that stems from the fact that the jury instructions relieved the Commonwealth of its burden of proving a critical and disputed element of the offense.

Baker has shown that he was convicted under constitutionally erroneous jury instructions and that those erroneous instructions had a substantial and injurious effect in determining the jury's verdict.  Therefore, he is entitled to habeas relief on his direct due process claim.

### C. Ineffective Assistance of Counsel

### 1. Deficient Performance

Baker claims that his trial counsel's failure to object to the defective jury instructions deprived him of his constitutional right to the effective assistance of counsel.[41]  To establish a claim of ineffective assistance of counsel, petitioner must establish both that his counsel's performance was deficient and that the deficient performance prejudiced his trial to the extent that it undermined confidence in the trial's outcome.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687-90 (1984).  To show that counsel was deficient, Baker must show that "counsel's representation fell below an objective standard of reasonableness."  <u>Id.</u> at 687-88.

Baker's trial counsel fell below an objective standard of reasonable performance when he failed to object to the trial court's instruction.  Under Pennsylvania law, an accomplice must individually possess the specific intent to kill in order to be found guilty of first degree murder.

---

[41]As I have already concluded that the writ must issue with respect to Baker's first degree murder conviction, I need not consider additional challenges to that conviction.  However, I go on to consider Baker's related ineffective assistance of counsel claim because it is so closely related to the underlying claim and requires relatively few additional judicial resources.

Bachert, 453 A.2d at 935.  Bachert was decided by the Pennsylvania Supreme Court in 1982 and

therefore its holding was clearly established law at the time of Baker's trial in 1984.  A

reasonably competent defense attorney would have recognized that the trial court's instructions

misstated Pennsylvania law and would have objected to the instructions.  Indeed, the

Pennsylvania Supreme Court later held that instructions almost identical to those given in

Baker's trial flagrantly misstated the law.  Huffman, 638 A.2d at 962.

      The Third Circuit's decision in Everett v. Beard, 290 F.3d 500 (3d Cir. 2002), requires

the conclusion that the performance of Baker's trial counsel was deficient.  The Everett court

found petitioner's defense attorney constitutionally deficient for failing to object to similar

instructions on accomplice liability and first degree murder in a trial that took place even before

the Pennsylvania Supreme Court decided Bachert.  Everett, 290 F.3d at 513.  At the time of

Everett's trial in 1980, Bachert had been decided by the Superior Court and was on appeal to the

Pennsylvania Supreme Court.  Everett, 290 F.3d at 510.  Even though the state Supreme Court

had yet to rule on the issue, the Third Circuit reasoned that Everett's defense counsel should have

known of the Superior Court's ruling and concluded that:

> Everett's counsel was ineffective by virtue of his failure to press
> the issue of whether an accomplice who did not have the intent to
> kill can be found guilty of first-degree murder based on accomplice
> liability, generally, and, in particular as this issue related to the
> instructions the trial court gave to the jury.

290 F.3d at 516.  Baker's trial took place after the Pennsylvania Supreme Court squarely ruled

that an accomplice must have the specific intent to kill in order to be found guilty of first degree

murder.  Therefore, Baker's trial counsel's failure to object to the erroneous jury instructions was

objectively unreasonable.

_____2. **Prejudice**

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691.  To succeed on his claim of ineffective assistance of counsel, Baker must also establish that his counsel's deficient performance prejudiced his trial to the extent that it undermined confidence in the trial's outcome. Id. at 687-90.  To demonstrate prejudice, Baker must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Baker has already established that the errors in the jury instructions were not "harmless errors" by showing that the erroneous instructions had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 638; Smith, 120 F.3d at 417. The standard for prejudice is slightly more burdensome than that of harmless error.[42]  But the "ultimate issue under either [the Brecht harmless error or Strickland prejudice] test reduces to determining what effect, if any, the erroneous instruction had on the jury's verdict." Whitney, 280 F.3d at 258, 258 n.19.

As explained above, the jury instructions permitted the jury to convict Baker of first

---

[42]A conclusion that, but for counsel's unreasonable failure to object to the erroneous instructions, there was a reasonable likelihood that the result of the proceedings would have been different "necessarily entails the conclusion" that the unconstitutional instructions had "substantial and injurious effect or influence in determining the jury's verdict," and therefore was not "harmless error." Kyles, 514 U.S. at 435-36.  But the converse is not necessarily true; a finding of harmful error does not necessarily entail the conclusion that the error was prejudicial. See Hertz & Liebman § 31.4c, at 1396 n.28.

degree murder as either an accomplice or as a principal actor.  The accomplice liability instructions erroneously permitted the jury to convict Baker of first degree murder without finding that Baker possessed the specific intent to kill, but there was no error in the instructions regarding principal liability.  The verdict sheet did not indicate whether the jury found Baker guilty of first degree murder as a principal or accomplice.  There are thus three relevant scenarios under which the jury might have convicted Baker of first degree murder.  First, the jury might have convicted Baker as the principal actor, in which case it necessarily would have concluded that Baker possessed the specific intent to kill.  Second, the jury might have convicted Baker as an accomplice and, had the jury been instructed to make such an inquiry, might have found beyond a reasonable doubt that Baker possessed the specific intent to kill.  Third, the jury might have convicted Baker as an accomplice, but had the jury been instructed only to convict an accomplice if the accomplice possessed the specific intent to kill, the jury would have had a reasonable doubt as to whether Baker possessed the specific intent to kill, and would therefore not have convicted Baker of first degree murder.  Under the first two scenarios, Baker would have been convicted of first degree murder regardless of whether the trial court had accurately instructed the jury on accomplice liability.  Baker's burden for purposes of the prejudice inquiry is to show that there is a reasonable probability that the third scenario describes his case.  Baker must show there is a reasonable probability both that the jury convicted him as an accomplice and that the jury would not have found beyond a reasonable doubt that he possessed the specific intent to kill, had they been instructed to make such an inquiry.[43]

---

[43]This a related, but slightly more burdensome inquiry than the harmless error inquiry. For purposes of harmless error, it was sufficient for Baker to show that the jury instructions so narrowed the jury's focus so as to leave it questionable that a reasonable jury would have

There is a reasonable probability that the jury convicted Baker of first degree murder as an accomplice.  As reviewed before, the trial evidence shows that there was substantial contradictory evidence regarding the identity of the shooter.  It is therefore reasonably probable that Baker was convicted not under a theory of principal liability, but under an erroneous theory of accomplice liability.

It is likewise reasonably probable that the jury would not have found beyond a reasonable doubt that Baker, acting as an accomplice only, possessed the specific intent to kill, had it been instructed that such a finding were necessary in order to convict an accomplice of first degree murder.  As already reviewed, there was substantial contradictory evidence regarding Baker's intent.  Consequently, it is reasonably probable that the jury would not have found that Baker, as an accomplice, possessed the specific intent to kill, had they been instructed to make such an inquiry.

Baker has shown that there is a reasonable probability both that the jury convicted him as an accomplice and that the jury would not have found beyond a reasonable doubt that Baker possessed the specific intent to kill, had they been so instructed.   Therefore, Baker has established that he was prejudiced by his trial counsel's unreasonable failure to object to the erroneous jury instructions.  He is therefore entitled to habeas relief on his claim of ineffective assistance of counsel.

As the writ must issue with respect to Baker's first degree murder conviction and

---

endeavored to answer the more difficult questions of whether Baker was the actual shooter and whether Baker possessed the specific intent to kill.  Smith, 120 F.3d at 419.  For purposes of the prejudice inquiry, Baker must show that had the jury been forced to confront the difficult questions, as they would have had to do had Baker's counsel objected to the erroneous instructions, there is a reasonable probability that the jury would have answered in the negative.

accompanying capital sentence, I decline to address Baker's additional claims challenging that

conviction and sentence.   See Laird, 414 F.3d 419, 2005 WL 1668678, at *1 n.1.


**XII.  Conclusion**

    Baker is entitled to habeas corpus relief from his conviction for first degree murder and

resulting sentence of death.

**ORDER**

**AND NOW**, this __15th___ day of August, 2005, it is **ORDERED** that the amended petition for writ of habeas corpus (docket #45) is **GRANTED** in part and **DENIED** in part as follows:

- The petition is **GRANTED** as to the first degree murder conviction and capital sentence.

- Petitioner's first degree murder conviction and capital sentence are **VACATED**.

- The petition is **DENIED** as to petitioner's remaining convictions and sentences.

It is **FURTHER ORDERED** that the execution of the writ is **STAYED** for 180 days to permit the Commonwealth to retry the petitioner and, if the petitioner is found guilty, a new sentencing on that charge.

S/Anita B. Brody

_____

ANITA B. BRODY, J.

_____Copies **VIA ECF** on            to:            Copies **MAILED** on            to:

O:\ABB\Baker opinion.wpd